[Crim. No. 2974. In Bank.—December 1, 1927.]

## THE PEOPLE, etc., Respondent, v. PHILIP A. GOODWIN, Appellant.

[1] CRIMINAL LAW — MURDER — MOTION FOR NEW TRIAL—MOTION FOR CONTINUANCE — DILIGENCE.—In a prosecution for murder in which the defendant moved for a continuance in order to present additional affidavits supporting his motion for a new trial, one of the affidavits being material and, if true, would have shown it to have been impossible for the defendant to have participated in the crime as outlined by the chief witness for the prosecution, it was prejudicial error to deny the motion for a continuance where the defendant was not lacking in due diligence in procuring the evidence.

[2] ID. — NEW EVIDENCE — DUE DILIGENCE.—In determining whether or not due diligence was used in an effort to procure new evidence, it is necessary to consider all the facts of each particular case, and it is held in this prosecution for murder that the defendant was not so lacking in due diligence under the circumstances as to warrant the denial of his motion for a new trial.

---

1. See 8 Cal. Jur. 213; 6 R. C. L. 556 et seq.
2. Diligence in procuring new evidence for new trial, note, 122 Am. St. Rep. 754. See, also, 8 Cal. Jur. 428; 20 R. C. L. 292.

[3] ID. — NEW TRIAL — DISCRETION — APPEAL.—While the exercise of discretion by a trial judge in granting or denying a new trial is rarely interfered with upon appeal, it is held in this case that the evidence offered was material and that, as the defendant was not lacking in diligence, his motion for a new trial should have been granted.

[4] ID.—FLIGHT—INSTRUCTIONS.—In a prosecution for murder it is error to instruct the jury upon the subject of the flight of the defendant as an indication of a guilty mind and of conscience of guilt, where there was no evidence of flight by the defendant after the commission of the crime; and an instruction upon that subject is defective which omits the essential qualification that where flight can be indicative of a guilty conscience the defendant must know that he is charged with the crime.

(1) 16 C. J., p. 1198, n. 45.   (2) 16 C. J., p. 1193, n. 9.   (3) 17 C. J., p. 252, n. 17.   (4) 16 C. J., p. 985, n 48.

APPEAL from a judgment of the Superior Court of Orange County and from an order denying a new trial. E. J. Marks, Judge. Reversed.

The facts are stated in the opinion of the court.

Cormac, Bolles & Surr and Buel R. Wood for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, John W. Maltman, Deputy Attorney-General, Z. B. West, Jr., District Attorney, and L. W. Blodgett, Deputy District Attorney, for Respondent.

LANGDON, J.—Defendant appeals from a judgment imposing upon him the death sentence after a jury had found him guilty of the murder of Joseph J. Patterson in Orange County, California. The information charged the defendant and one Allison Dewey, whose true name appears to be Gaines, with the crime. Separate trials were had, the defendant herein being first brought to trial and the testimony of defendant Gaines being largely responsible for his conviction.

3.   See 8 Cal. Jur. 442, 581; 2 R. C. L. 218.
4.   Flight as evidence of guilt, notes, 39 L. R. A. (N. S.) 58; 25 A. L. R. 886. See, also, 8 Cal. Jur. 44, 346; 8 R. C. L. 192.

A charred and badly decomposed human body was found in an isolated spot in Santa Ana canyon on March 22, 1926, which was identified later, beyond a reasonable doubt, by means of portions of clothing, belt buckle, watch fob, and other trinkets, as the remains of Joseph J. Patterson. For the purpose of this appeal, we will state that it also appeared beyond reasonable doubt that deceased had received, in some manner, a blow on the back of the head, which broke the skull and was sufficient to have caused death, and that an attempt had been made to burn the body in the place where it was found. No eye-witness testified as to the killing. All the testimony was circumstantial, and the circumstances pointing directly and convincingly to the guilt of defendant were testified to by the co-defendant Gaines. This witness had served two sentences in the Utah state penitentiary and had pleaded guilty to a forgery charge in California. After he came to Los Angeles, California, in February, 1926, he appears to have engaged in no occupation, and his own account of his activities shows frequent use of assumed names, excessive drinking, brawls, and fights at public dancehalls, the cashing of checks which, to say the least, he knew to be forged, if he did not himself forge them, and other matters not tending to inspire confidence in the truth of his testimony, especially when his own life was at stake in the event this crime was not fastened upon defendant Goodwin.

From the record it would seem that either one or the other of the defendants committed the crime charged. The defendant Goodwin tells a story, which if true, would exonerate him. He was subjected to a grilling cross-examination and, as admitted by the district attorney in his remarks to the jury, every trick of cross-examination learned in thirty years' experience was tried upon him and, nevertheless, his story did not weaken. In the language of the district attorney, defendant was "the worst man in cross-examination I have ever seen," and "I hadn't examined Philip A. Goodwin ten minutes before I knew as well as I know now that I would make no progress" and "I realized fully when I had met my Waterloo in cross-examination." It was a long, hard, grilling cross-examination, and the experience of ages has shown that this is usually the acid test of truth. On the other hand, the testimony of the co-defendant Gaines is not

only inherently improbable in numerous particulars, but the witness shows many unmistakable signs of indecision, uncertainty, and evasion. No adequate idea of the false "ring" of this testimony, taken as a whole, can be given by a statement of portions of it. The record is voluminous, consisting of over 800 pages, and all parts must be fitted together for an impartial consideration of it. This cannot be done in this opinion, and we shall have to trace, briefly, merely the outlines of the two stories told by the co-defendants.

For about a month before the crime was committed, which was fixed by the evidence as about March 14th or 15th, Gaines occupied a room in the house where Patterson lived in Los Angeles. Goodwin lived in the same block. Goodwin and Gaines had known each other in the Utah state penitentiary, where they were fellow-prisoners, and had corresponded after their separation. Gaines came to Los Angeles in February, 1926, and Goodwin met him at the railway station and engaged a room for him in the rooming-house where Patterson lived. Gaines and Patterson became friendly and Patterson, who was engaged in buying and selling stocks, purchased some stock for Gaines and probably owned some himself, which he carried about with him. Patterson did not have much money. His bank balance showed a maximum of $200 during the period involved in this investigation. A check upon Patterson's bank account for $130 was forged by someone—either by Gaines or Goodwin, according to the story which we accept. And it is pertinent to inject here the statement that the attorney-general concedes upon this appeal, although at the trial it was contended otherwise by the prosecution, that this forgery was the work of Gaines. This check, payable to Samuel Reader, was indorsed with that name, confessedly by Goodwin, and was taken by Goodwin to a bank, together with ten dollars in cash, and deposited in an account opened in the name of Samuel Reader, apparently a fictitious person. This amount was later drawn out through checks signed by Goodwin with the name of Samuel Reader, which he had written on the signature card opening the account. We shall not go into the explanation made of this transaction by Goodwin because, in our view of the record, it becomes immaterial at this time.

A few days after the transaction just narrated, the journey began on which Patterson met his death. Gaines says: That Goodwin hired an automobile and invited Patterson and Gaines to accompany him on a trip to San Diego, and that the three started from Los Angeles on Saturday, March 13, 1926, to San Diego; that Gaines drove the car and Goodwin and Patterson sat in the rear; that at San Juan Capistrano, Gaines was arrested for speeding; that Goodwin left the car and spoke to the policeman making the arrest and signed the name of E. A. Cramer to the slip presented by the officer. The party then proceeded south, and toward evening invited a soldier, who was walking along the highway, to ride with them, and he rode with them to San Diego. The party stopped at a restaurant for food and, later, left Goodwin at the Knickerbocker Hotel with the understanding that the three would meet the following morning; that Gaines and Patterson then went to the Manhattan Hotel, each registering under an assumed name. Patterson and Gaines then went to a dance, where they did considerable drinking, and after the dance returned to their hotel. The following day they met Goodwin about noon as they were driving about the town and he told them he had business to attend to and asked them to meet him at the Knickerbocker Hotel at about 6 o'clock. Patterson and Gaines then drove around until the time indicated and then returned to the Knickerbocker Hotel and met Goodwin. They had dinner together and then went to a cigar-stand and shook dice for cigars. They then drove to a filling station and had the gasoline tank of the automobile filled. Goodwin suggested that it was a long way between towns and more gasoline might be needed, and as the man at the station had nothing in which to place additional gasoline Gaines "went across the street from the filling station and bought a can" at a second-hand store. This five-gallon can was half filled with gasoline and placed on the floor of the rear of the car. Goodwin then asked Gaines if he had any liquor, and when Gaines replied that he had not, Goodwin gave Gaines five dollars with which to purchase liquor, with the statement that it would be chilly on the return trip. Gaines purchased two pints of whisky from a sailor and the three men started to Los Angeles. At the request of Goodwin, one bottle of liquor was handed to him. Gaines did not

know the roads and Goodwin announced that they would return over a route different from the one on which they had traveled to San Diego. He then directed the driver and he, following directions, reached Escondido about midnight, where they stopped for food. They then returned to the automobile and "rode along on the road a long time, and then Goodwin says that it was the wrong road and we would have to turn around and go back." Gaines then turned around and went back to where he had "turned on that road and started out again." Patterson at that time was not "very drunk"; he did not show the effect of liquor "very much." On the new road they stopped a "couple of times." Gaines doesn't remember whether or not they passed through any towns. Goodwin asked Gaines several times if he was all right. Gaines "had to get up close to the windshield to look through to stay on the right-hand side of that mark," because, according to his testimony, "I was pretty full and I couldn't hardly stay on the right-hand side of the road. I would have to get up close to the windshield to see that I was on the right-hand side of the mark or not, and I got over it, I guess, quite a few times." And now it is about 7 o'clock, "the sun was up or just coming up, anyway; it was light and you could see all over." And Goodwin said Patterson was pretty drunk and he didn't intend to go back with him in that condition, and he said he knew some people down there a ways from where we were and he was going to take him over and sober him up before we took him back. And they came to "where you could see a gate a little ways before you got to it" and Goodwin said, "We will turn into that gate" and Gaines pulled up to the gate and stopped and Goodwin got out and opened the gate. What followed, we shall set out in Gaines' own words: "I guess we was about half-way between the gate and where we stopped down there and he says: 'You can't get clear over in the car because there is a foot bridge.' You could see the houses plain, there was a couple of houses over here some place (referring to photograph) . . . and we got down to a place in there and it was a sort of a bare spot—there ain't no grass on it. It was sand . . . and we turned to the right and when I turned to the right I stopped, or he said 'stop' and I started to get out. . . .

And he said: 'Right about here is a foot bridge you can't drive over with a car' and when I turned to the right and stopped I started to get out and I said 'Let me help you' and he said 'No, you go back and shut the gate because the cows might get out' . . . and he took the can and set it out just outside of the automobile, just away from the running board . . . Goodwin set the can out, just along-side of the car for a seat, he said, to sit Patterson on, and he helped Pat out and set him on that can . . . and I turned and drove the car up here and turned around that way and come right back by where we were and got on this road that goes out to the gate. . . . I turned to the right and turned around and went back to that road up to the gate. . . . He said: 'Wait at the gate' Goodwin, he said, 'Wait at the gate' until he hollered and then I would know that he was ready to go back. . . . I drove up to the gate and went outside the gate and stopped and shut the gate and got back into the automobile and set there with my feet up around the steering-wheel . . . outside the fence. Well, I didn't know if I dozed off or not, but the next I noticed why Goodwin was coming through the fence—I don't know if he came through the fence or gate but I heard the tin scratching on the wire and I set up and looked and he was coming to the car and I asked him where Pat was." Goodwin had with him the five-gallon can. "I believe it was empty . . . and I asked him where Pat was and he said, 'Oh God, don't discuss it, let's hurry away' and I asked him again and he said 'I told you not to discuss it' so I drove on down the canyon and we crossed a bridge quite a ways after that . . . and it was quite a ways after that that we crossed a kind of a long bridge but there was no water in the bed—it was just dry, and he threw the can over the bridge . . . and we went back to the place where he got the automobile."

In response to a question as to Goodwin's appearance when he first returned to the car, Gaines answered: "Well, he was all nervous and worried and excited . . . he was all nervous and upset . . . and I guess a little further down this road right about here, down the road further, I looked back in that direction and saw smoke coming up." Gaines states that he had been drinking along the way from San Diego and that Patterson had also been drinking and

when asked whether or not Goodwin had been drinking, replied: "Well, I don't know as I seen him take a drink." According to Gaines, when he last saw Patterson, Patterson was pretty drunk. . . . He was sitting facing that way, sort of stooped over like that. . . . Goodwin was on the left-hand side of him with his arm sort of around him."

Contrast with the foregoing Goodwin's story of the journey south, as follows: Goodwin and Gaines started to San Diego in an automobile. They "picked up" a young man upon his signal at the first little town out of Los Angeles and took him with them upon his request for a "lift." They stopped at Whittier for a few moments to interview a theater manager (Goodwin had written several plays, had been an actor and was at that time producing a play). They drove to Fullerton, where Goodwin stopped to greet some friends, and then down through Anaheim, Santa Ana and into San Juan Capistrano, where they were stopped by a traffic officer. Goodwin got out and talked to the officer and the driver, Gaines, signed the "speed tag" presented to him by the officer. They then drove on without stopping until they came to the marine base, near San Diego, where the soldier or marine with them left the car. They drove to the Knickerbocker Hotel and Goodwin got out and Gaines said he would put the automobile in the garage and return. Goodwin could not be accommodated at the Knickerbocker and tried another hotel without being able to secure accommodations and finally secured a room at the Warren Hotel. After making his arrangements and leaving his baggage, he returned to the Knickerbocker Hotel to meet Gaines. Gaines was not there and Goodwin went into the coffee-shop of the hotel and had some food and then walked to the Balboa Theater and as he got there he met Gaines and Patterson and a man in sailor's uniform. Goodwin had met Patterson prior to this time in Los Angeles, and the two exchanged greetings. This was about 10 o'clock Saturday evening, March 13. Patterson and Gaines said they were going to a dance and invited Goodwin to come with them, which invitation Goodwin declined. Gaines said he had missed Goodwin at the Knickerbocker Hotel. Gaines also said he was going to Tia Juana the following morning; that that was his main purpose in coming south and he did not know what time he would get

back. Goodwin, who was a clergyman, stated that he would go to church in the morning and after that, to the hospital to see a friend—Kehler—and that he would come downtown about 1 o'clock. Gaines said he would meet him at that hour at the Knickerbocker Hotel. Goodwin then left Patterson and Gaines and went to the Pantages Theater and visited a young man who was working there· and returned to his hotel about 11 o'clock and went to bed. On Sunday morning, March 14, Goodwin went to the All Saints Episcopal Church, and afterwards went to the Naval Hospital to visit George Kehler. After the visit Kehler decided to accompany Goodwin back to town, where they met Gaines in front of the Knickerbocker Hotel. They went to the coffee-shop together and then went to the cigarstand and shook dice for cigars and then got into the automobile and drove around to the beach and other places. Kehler left the automobile in front of the Balboa Theater and Goodwin rode back to the Knickerbocker Hotel, reaching there about 4 o'clock in the afternoon. Gaines said he was going back to Tia Juana. We continue the story in the language of Goodwin: "I said, 'Well, what time will you be back here?' and he said, 'That I do not know.' 'Well,' I said, 'I understand the customs regulation closes the line at nine o'clock, so you ought not to be very late. Will you be back to-night?' and he says, 'I guess so if the line closes.' And I says 'If you are coming to-night I won't register at the hotel for to-night. I will wait for you,' and he says, 'Wherever you want I will meet you.'" Goodwin then asked if Gaines knew where the naval Y. M. C. A. was and upon being told he did not, Goodwin pointed it out to him. It was arranged that Gaines would meet Goodwin there and Gaines drove away. "He said he was going back to Tia Juana—that he had left Mr. Patterson in Tia Juana and he was going back, and I asked him if he was going to bring Patterson back and he said, 'That I don't know. If he wants to come, all right, and if he wants to stay with his other friends, all right.' . . . At three-thirty in the morning, I was sitting talking to someone in the lobby of the men's service room at the Y. M. C. A. and I kept watching the road at all times because I was where I could see all the cars coming down the street." At approximately 3:30, Gaines drove up. "I went down the steps and

got in the car and we left for Los Angeles . . . Mr. Gaines and myself . . . Mr. Gaines and myself were alone on the return trip." They returned to Los Angeles between 8:30 and 9 o'clock in the morning and turned the automobile in and Goodwin went home and to bed.

For the purpose of this appeal, the foregoing consideration of the evidence seems sufficient, without going into the mass of other evidence in the record regarding the handwriting and the effort to connect Goodwin with forgeries of the name of Patterson to stock certificates and checks. It may be conceded that there were certain financial transactions, which occurred both before and after the journey to San Diego, in which it appears that money and securities belonging to Patterson were obtained by one or the other or both of these co-defendants, and which would tend to furnish a motive for the crime, and there were certain letters written by either or both of said co-defendants for the obvious purpose of explaining Patterson's failure to return to the place where he was living, and of delaying an investigation into his disappearance. During the trial it was evidently the theory of the prosecution that these letters, written apparently from San Diego and purporting to be signed by Patterson, were written and signed by Goodwin and that the indorsements on the certificates of stock were also forged by Goodwin and that the check for $130, which was used to open the Samuel Reader account, was also forged by Goodwin, the defendant Gaines, upon whom the prosecution relied to make out its case, having strenuously denied that he had written the name of Patterson on any of these instruments. However, the attorney-general now concedes that these forgeries were committed by Gaines, which concession puts a very different aspect upon the case made out by the prosecution and which was before the jury. And it is further admitted by the district attorney in his argument to the jury, and it is entirely clear from the record, that if Goodwin was in the Service Men's Y. M. C. A. at San Diego, as he states, until 3:30 in the morning of Monday, March 15, the story of Gaines, in so far as it is directed to the journey from San Diego to Los Angeles, is false *in toto* and there is no evidence placing Goodwin at any time at or near the vicinity of the place where the body of Patterson was found.

However, we are not passing upon the sufficiency of the evidence to support the verdict, but we merely consider it in its bearing upon the motion for a new trial.

A motion for a new trial was made upon the ground, among others, of newly discovered evidence. Among the affidavits filed in support of said motion was one by J. A. McKenzie to the effect that said McKenzie had been in the Service Men's Y. M. C. A. at San Diego on Sunday evening, March 14, and Monday morning, March 15; that between the hours of 12 o'clock midnight of Sunday, the fourteenth day of March, 1926, and 3:30 A. M. of Monday, the fifteenth day of March, 1926, the affiant talked with Philip A. Goodwin, who was dressed as a priest; that the said Goodwin gave affiant a card with the name printed thereon, Philip A. Goodwin; that, later, affiant saw pictures of said Goodwin in a Los Angeles newspaper, a copy of which is appended to the affidavit and made a part thereof, and affiant is positive that this is a picture of the same Philip A. Goodwin that he saw in said Y. M. C. A. in San Diego on the dates and at the times mentioned.

It appears that defendant did not know the name of this man with whom he had talked while in the Y. M. C. A. at San Diego and had no means of finding him except by advertising for him and he had done this and had received a response to the advertisement only after the verdict had been rendered against him. The trial court deemed this showing insufficient because the advertising had not been started earlier.

There were also other affidavits offered which tended to corroborate the defendant's story in many particulars.

[1] Counsel for defendant begged for a continuance in order to present additional affidavits supporting the motion for a new trial. Defendant presented a telegram from Bangor, Maine, in which it was stated that affidavits were in the mail by E. Stanley DeGroot to the effect that defendant Goodwin was seen by affiant in the Pantages Theater at San Diego on Sunday evening, March 14, at a time when Gaines' testimony places him elsewhere. This affidavit, together with the McKenzie affidavit, would be material and if their recitals were true, it would have been impossible for defendant Goodwin to have participated in the crime as outlined by the chief witness for the prosecution. This

corroborating testimony was, therefore, of the utmost importance and of a character that might well change the result if a new trial were granted, and unless the defendant was lacking in due diligence in not producing this evidence at the first trial, it should furnish ground for the granting of his motion for a new trial.

[2] In determining whether or not due diligence was used, it is necessary to consider all the facts of each particular case. In the instant case the record discloses that at the time of the trial Goodwin was without funds and for some time was without an attorney. He was forced to ask for several continuances because the attorney he had engaged had declined to act without the payment of a fee and Goodwin had been disappointed in securing the money for the fee. When it became necessary to obtain new counsel, the attorney who tried the case was brought in from another county and arrived the evening before the day when the trial was to begin. He asked for a continuance of ten days or two weeks, claiming that he was unfamiliar with the case and had not even examined the transcript of the evidence at the preliminary examination. The record shows that a continuance of but two days was given and lack of preparation of counsel is manifest throughout the trial. The record discloses that this attorney was so nearly blind that he was compelled to rely upon his daughter to read not only the transcript of the daily proceedings, but all the exhibits and documents offered at the trial and he was also suffering from other physical infirmities of a most serious nature. He had little or no time to prepare for this lengthy trial, while the intensive preparation of the district attorney is shown in his careful and masterly handling of the prosecution. It is not surprising therefore, that defendant Goodwin was unable to communicate with McKenzie, whom he did not know, nor to locate De Groot, who was on a theatrical circuit, and to have them present at the trial. On the other hand, it seems to us that the response of McKenzie to the advertisement in the paper and the finding of DeGroot through the theatrical booking agencies was an extraordinary accomplishment under the circumstances.

Defendant stated to the court, and it appeared from the record, that he had been obliged to change attorneys sev-

eral times because those who had undertaken to represent him would not proceed without a retaining fee. Defendant claims to have depended upon one of these attorneys, perhaps without justification, to follow up information which defendant gave him and communicate with witnesses, and to have found out, later, that nothing had been done. Eight months had passed since the events, in question occurred and defendant could not surmise what would be vital or necessary to his defense until Gaines had told his story. From the record it appears that defendant had no knowledge of what Gaines' testimony would be until it was given on the stand, and it was only at the close of the trial that he was handed a copy of the alleged written statement of Gaines, which he had made to the district attorney previous to the trial and of which the district attorney had had the benefit in advance, as a basis for the prosecution. Under these circumstances, can it be said that there was a lack of due diligence in obtaining the evidence set forth in the affidavits? Due diligence depends largely upon the peculiar circumstances of each case, and in this case, we think there was not such a lack of diligence as would warrant the denial of a motion for a new trial. [3] While the exercise of discretion by a trial judge in granting or denying a new trial is rarely interfered with upon appeal, in this case, the evidence offered being material and, under the circumstances, it not appearing that the defendant was lacking in diligence, we feel that the motion for a new trial should have been granted.

[4] The record also presents an additional reason for the reversal of this judgment. With a record as unconvincing against the defendant as the one in the instant case, any error in the matter of instructions or rulings upon evidence looms large. The trial court instructed the jury "that the people have offered evidence for the purpose of showing flight, and this evidence you shall not receive as a part of the criminal act itself, but if you should find, beyond a reasonable doubt, that there was a flight, that is, a leaving of the state of California, for the purpose of avoiding a prosecution, then you should receive the same only as an indication of a guilty mind and the same is to be considered by you only as a circumstance to be

weighed by you as tending in some degree (if there was such flight) to prove a consciousness of guilt.''

There is no evidence in the record showing flight of the defendant. Long before the crime was committed he had been planning and discussing a journey to New York to ''try out'' a play which he had written, and which he had rehearsed and played in Los Angeles. The unidentified body of Patterson was found on or about the twenty-third day of March, 1926, and Gaines left Los Angeles the following day, apparently leaving no trace of his whereabouts. On April 6, or thereafter, Goodwin went to New York. He wrote to his friends from there and told about the progress he was making with his play. He was presenting it publicly in New York and appearing in it. The circumstances surrounding flight are placed before a jury as admissions by acts tending to show guilt, and, assuredly, there was nothing in Goodwin's conduct with reference to his departure from Los Angeles and his subsequent whereabouts which would warrant any inference of a consciousness of guilt. In *People* v. *Jones,* 160 Cal. 358 [117 Pac. 176], in considering an instruction similar to the one we are discussing, the court said: ''This court has for a long time discountenanced the giving of such instructions and has refused to reverse cases where they have been given only when it could be seen that the instructions did not work injury. Thus, where a defendant flees immediately after the crime has been committed *with which he knows he is charged and the reason for his flight remains unexplained,* this court has, in effect, said that it would not reverse cases for an instruction in substance declaring to the jury that this evidence can be by them considered and given such weight as they thought fit as tending to indicate a guilty mind. But this court, as has been said, has frowned upon the giving of any such instructions because it is clear invasion of the jury's province in weighing evidence and may work much injury and prejudice to a defendant's case. The instruction here given is typical. In the first place, *it omits the essential qualifications that where flight can be indicative of a guilty conscience the defendant must know that he is charged with the crime.*

''But more important even than this, *we have before us a case where the flight of the defendant was explained,*

where it was in evidence that he feared mob violence and fled to avoid it, and where it was in evidence that when away from the mob he was called upon to surrender, he promptly did so. Here, certainly, it was for the jury to determine what prompted the flight and if it was prompted by fear of mob violence, as defendant says, then no element of guilty conscience entered therein. . . . Where flight is unexplained the giving of such an instruction may be excused, though not justified, because it is within the power of the defendant to explain it and he has not done so; but where the defendant has given a full explanation of his flight it is for the jury to say whether that explanation is true or not, untrammeled by any instruction from the court to the effect that the evidence is to be weighed by them as indicative of guilt.''

Considering the state of the record in the instant case, with its conclusive evidence that defendant gave information to everyone interested that he was going to New York and his purpose in going there, long before the crime in question was committed; that he left Los Angeles weeks after the crime was committed and when no shadow of an accusation had been made against him; that he announced his departure and did not conceal his whereabouts, and engaged in the business upon which he had been planning to visit the metropolis, the instruction complained of is not based upon evidence before the jury and was prejudicial to the rights of the defendant.

There are other errors appearing in the record of more or less importance, which it is not necessary for us to discuss separately, as they will probably not arise upon a second trial. The matters we have discussed, in the light of the entire record, require a new trial.

The judgment is reversed with instructions to the trial court to grant the defendant's motion for a new trial.

Preston, J., Richards, J., and Curtis, J., concurred.

Rehearing denied.

Waste, C. J., Seawell, J., and Shenk, J., dissented.