[Crim. No. 3801. First Dist., Div. One. May 15, 1961.]

THE PEOPLE, Respondent, v. BOBBY GAINES, Appellant.

Louis M. Bernstein, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, Arlo E. Smith and Robert R. Granucci, Deputy Attorneys General, for Respondent.

TOBRINER, J.—Convicted of robbery in the first degree, appellant attacks the judgment and the order denying his motion for a new trial upon three grounds: (1) that the trial court should not have admitted into evidence the police officers' testimony as to appellant's reaction to the playing of a recording of his codefendant's confession, which implicated appellant in the crime; (2) that the court erred in denying his motions for a continuance and a new trial on the ground of newly discovered evidence; and (3) that the evidence did not sufficiently support the verdict and judgment. We shall explain why we have rejected the first and third of these contentions and accepted the second.

At approximately 7:45 p. m. on October 28, 1959, two men, one armed with a revolver, obtained about $100 by the robbery of Mrs. Patricia Barner, a ticket-booth cashier at a drive-in theater. Although the evening had become dark, the ticket booth and the adjacent area were lighted with artificial lighting.

The two men drove up to the booth in a pale green, older model General Motors car. Mrs. Barner saw them seated in the front seat, both with nylon stockings over their faces. The man on the passenger side held a gun in his left hand and asked her for money. Getting out of the car, the driver went around the back of the car, to the side of the booth, and reached into the booth and took one-dollar bills and change. He asked if there was anything else; she gave a negative answer; she overheard him say, " 'Now don't forget the count'. . . ." He ran back to the driver's side of the car. As the men drove away, Mrs. Barner observed the license number

of the car. She later identified a car found by the police as the one used in the robbery.

Both defendants, Lewis and Gaines, were arrested on November 6, 1959. An examination of Lewis' car disclosed a fully loaded .22 caliber automatic pistol concealed underneath the spare tire, a nylon stocking in the hubcap, and some ammunition in the glove compartment.

When told of the results of the search, Lewis admitted the robbery and implicated Gaines. Lewis later gave a second statement, which was recorded; most of the statement, admitted into evidence, was read to the jury. At the trial Lewis testified that the prosecution had obtained the confession by "threats" and "promises," although he admitted he had not been subjected to any physical coercion.

The officers informed appellant that Lewis had given them the confession. Appellant answered, " 'Oh, yeah, that's what you want me to believe'. . . ." The officers then played the recording of the confession to him. They asked appellant if he wanted to make a statement; he responded, according to Officer Hutchings, as follows: "He says, 'No.' He says, 'My sister is going to get an attorney for me.' He was told, 'If there was any reason why you should not be charged with robbery, we would like to know.' He stated, 'Anything that I have to say wouldn't help me.' I says, 'Well, you see, Wendell Lewis put you right in there. You heard the statement.' 'He can cop out if he wants. My sister is going to get an attorney for me. Put me back in my cell. I have nothing to say. I won't talk.' "

According to appellant, when Officer Hutchings "started telling me that I had robbed the San Jose Drive-In, and things like that, . . . I told him that I didn't, and . . . he kept telling me that I did it, and finally I told him, 'Well, I can prove where I was'. . . ." Appellant testified, "I kept trying to tell him that he wouldn't give me no chance, so I just said, 'I've got nothing else to say.' "

Appellant testified that he spent the entire evening of October 28th at a bar in Alviso known as Tony's Place; indeed, six witnesses stated that they had seen him there at that date from approximately 6:30 p. m. until 10 or 11 p. m. Thus William Paul Hawn placed him at the bar during those hours, saying further that he did not "believe" appellant could have left for "say, an hour" without Hawn's having noticed it. Hawn also testified that Lewis had come in early in the eve-

ning and that he and appellant had "stepped out on to the porch, and they talked for . . . maybe five minutes. Bobby came in, and I think Wendell left." Rita Hawn testified that she and Gaines "were sitting together the entire evening" and that he was out of her sight "[t]en minutes or so." She, too, testified that early in the evening Lewis said a few words to Gaines and that Lewis came in again about 9 or 9:30 p. m. and left alone. The owner of the bar, Felix Garcia, had his "eye on" Gaines "off and on" during the time sequence from "close to seven" until Gaines left with his sister and brother-in-law "around 10:30." Frank C. Murray testified "I believe he [Gaines] was around there all evening. . . ." Norman L. White gave substantially the same account. Appellant's sister, Pauline Bacigalupi, attested Gaines "was around the room there, but I never missed him out of my sight very long at a time."

On November 10, 1959, Patricia Barner examined 28 photographs and recognized one. That afternoon she picked Gaines out of a line-up of five men. At the trial she identified Lewis and Gaines as the men who robbed her.

The jury returned a verdict convicting both defendants of first degree robbery. Two weeks after the trial, appellant moved for a new trial and asked that the matter be continued so that he could adduce affidavits and testimony of Lewis to the effect that appellant did not accompany him or participate in the robbery. The court denied the motion, stating that such a procedure could not be followed and that it would not open the case to enable Lewis to testify.

We first analyze appellant's contentions that the court erred in admitting into evidence his responses to the police officers' questions upon the playing of the record of his codefendant's confession. Despite our conclusion that this testimony should not have been admitted, for the reasons we shall elucidate, we believe that the cases hold that appellant waived the error by his failure to object to such admission.

In the leading case of *People* v. *Simmons* (1946), 28 Cal.2d 699 [172 P.2d 18], the refusal of the defendant there to respond to the police officers' questions and defendant's insistence upon silence roughly parallel the reactions of appellant here. In *Simmons,* the police on three instances confronted defendant with accusatory statements, and his responses were typified by those of one of such occasions: after presentation of the statement, defendant "was asked, 'Did you read it

all?', and he said, 'Yes.' He was then asked, 'Well, what do you think of it? Did she tell everything?', to which defendant replied, 'Well, she told enough,' and in response to the further question, 'What do you think about it?', defendant said, 'I told you all I am going to tell you. I have nothing more to say.' " (Pp. 711-712.)

The Supreme Court declared that "the admission in evidence of these statements was clearly erroneous," (p. 721) but did not reverse the conviction because of the overwhelming impact of the other evidence of guilt. As to the defendant's statements the court said: "He was, or should have been advised by them [the police officers], but at any rate knew from his past criminal experience, that anything that he might say would be used against him and that he did not have to make any statements. He therefore quite properly remarked, . . . 'I told you all I am going to tell you. . . . I am not going to tell you anything else.' This, while not a denial of the contents of the statements, was certainly not an admission of their truth, and it did not lay a foundation for the introduction of such hearsay evidence under the rule herein announced. In other words, it is obvious that defendant was attempting to exercise his constitutional privilege against self-incrimination. . . ." (Pp. 720-721.)

We see no basic distinctions between Simmons' attempt to "exercise his constitutional privilege against self-incrimination" and appellant's effort. Appellant's assertion that Lewis could "cop out if he wants" conveyed no more than the idea that Lewis could plead guilty if he pleased; it did not mean appellant did so.

And yet appellant's failure to enter an objection to the admission into evidence of his response to the accusatory statement must be fatal to his position here. We recognize that appellant's attorney faced a form of dilemma when the prosecution offered this testimony. Lewis' confession had already been admitted. It is true that the court, upon appellant's objection, had admonished the jury that "as far as the Defendant Gaines is concerned, you are not to consider it [the confession] for any purpose" and that it was not "binding upon the Defendant Gaines." Nevertheless a confession once heard, cannot be confined in an insulated chamber of the mind; formal instructions cannot protect against the psychological impact of one codefendant's confession as against the other. If appellant's counsel had objected to proof of Gaines' reaction to the confession, the jury might have concluded

Gaines acquiesced in it. Despite the difficulty of choice, however, appellant necessarily made his election, and it is binding.

The cases clearly require the objection. *People* v. *Millum* (1954), 42 Cal.2d 524 [267 P.2d 1039], states explicitly, "defendant may not now assert that error occurred through the introduction of certain accusatory statements which were made by one of the narcotic agents to the defendant. As was said in *People* v. *Stepp,* 82 Cal.App.2d 49, at page 51 [185 P.2d 417] : 'Section 1870, subdivision 3, of the Code of Civil Procedure authorizes the admission of such testimony, and when it is admitted without objection, there is no error on the part of the trial court which may be urged on appeal.' " (P. 528.)

*Millum* disposes of any contention that *People* v. *Simmons, supra,* 28 Cal.2d 699, establishes a different rule or that the right of appellant here to avoid the introduction of the testimony reaches such constitutional proportions that the appellate court must save it despite a lack of objection. It is true that Justice Carter in *Simmons* proceeded to the substantive issue although the defense had failed there to interpose the objection. But Justices Shenk and Spence in a concurring opinion specifically relied upon the waiver, and *Millum,* indeed, cited the *Simmons* case as authority for the waiver, evidently relying upon the concurring opinion. (See Comment, 6 U.C.L.A. Law Rev. (1959), p. 593, f.n. 51 at p. 601.) That case, as well as *People* v. *Stepp* (1947), 82 Cal.App.2d 49, 51 [185 P.2d 417], make the rule manifest. *People* v. *Clemmons* (1957), 153 Cal.App.2d 64, 78-79 [314 P.2d 142], which apparently held that the point could be argued on the appellate level in the absence of objection, does not successfully establish such a proposition in view of the court's failure to refer to, or observe, the *Millum* rule.

Appellant's constitutional argument, although derived from the general statements in *People* v. *Rodriguez* (1943), 58 Cal. App.2d 415 [136 P.2d 626], succumbs to the limited application of the doctrine announced in *Millum.* The Supreme Court specifically confined the application of the *Rodriguez* rationale to instances in which the prosecution obtained the confessions by brutality or by sustained interrogation under circumstances which, in violation of the due process clause of the Fourteenth Amendment, were " 'inherently coercive.' " (P. 526.) The court specifically denied the right of a defendant to raise for the first time on appeal the issue of an erroneous admission

of accusatory statements. Appellant is thus precluded from asserting the error here.

 We now turn to the crucial issue of the trial court's refusal of a continuance of the hearing on the motion for new trial. Appellant requested further time to produce affidavits or testimony of newly discovered evidence. We shall explain why we believe the request should have been granted.

The elements that determine whether or not a court arbitrarily rejected a request for a continuance of a motion for a new trial cannot be categorized. They are not subject to precise delineation fixed by precedent. We cannot name any single detail of fact which prompts our ruling; neither can we set out all of them in particularity. At the hearing for new trial the defense offered to show that a vital element in the full story had been shaken. A reading of the whole transcript tells us that in view of the importance of the offer the defense should have had the opportunity to make its requested showing.

This is not a black and white case where the shadow of guilt falls upon every page of the transcript. Six witnesses definitely located appellant at Tony's Place on the night of the robbery, during the time of its perpetration. True, the prosecution discounts these accounts as "parroted" and insinuates that they were prearranged. But the prosecution's case depended upon two major props: the identification of appellant by the ticket seller at the drive-in movie and the asserted reaction of guilt of appellant upon the confrontation of his codefendant's confession. The second of these is now questioned.

The Lewis confession directly and unequivocally pointed the finger of guilt at appellant. At the hearing of the motion for new trial, the defense sought to "present suitable affidavits" and stated that "we offer to prove that if Mr. Lewis is called as a witness that he will repudiate his confession." The prosecution answered, "Well, on that basis we would still ask that the motion be denied because it wouldn't add anything to this particular case." The court replied, "*And* I don't think it's proper procedure, and the motion will be denied." (Emphasis added.)

We fail to see why (1) the showing would not "add" to the case, (2) the suggested procedure by affidavit was improper, or (3) "the affidavit of Lewis" as contended by the prosecution "establish[es] that appellant has not shown that 'due diligence' required by section 1181, subdivision 8 of the *Penal Code.*"

First, as to the showing, we have noted that appellant's reaction to the confession served as one of the two foundation stones of the structure of guilt. How could the removal of the support fail to shake the stability of the frame? Indeed, we have pointed out that appellant's statements as to the accusations should not, upon proper objection, have been admitted. Now we compound upon this very testimony a proffered showing that the confession, upon which its erroneous admission rested, was itself false. The testimony, which we think is inadmissible, emanates, then, from the use of a false confession. Certainly conviction cannot rest, with certainty, upon such a composite. We think it was unreasonable to deny the sought continuance to prove the repudiation of a confession which was crucial in the circumstances of this case.

Second, as to the procedural objections to the continuance, we believe the importance of the offered proof of repudiation of the confession so far outweighed any possible inconvenience of delay that the refusal constituted "a breach of discretion on the part of the trial judge. . . ." (*People* v. *Reed* (1938), 27 Cal.App.2d 484, 492 [81 P.2d 162].)

Section 1181, subdivision 8, of the Penal Code empowers the trial court in its discretion to grant a continuance for this purpose: "When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable." In *Reed* the issue of continuance arose when the defense sought to produce affidavits to prove that some witnesses had mistakenly identified the defendant "Wallace Reed" for another individual so named. In explaining the offer, the court points out "defendant could hardly have been guilty of stealing the Dodge if he was at his place of employment six days during each week." (P. 492.) Nor could appellant have been guilty of the robbery here if the convicted codefendant truthfully asserted that appellant was not with him. As the court stated in *Reed* in reversing the trial court's refusal of a continuance: "The delay meant nothing to the people and might have meant much to defendant if the affidavits supported the statement of his counsel." (P. 492.)

Third, respondent relied upon Lewis' affidavit of repudiation for a showing of appellant's lack of due diligence in

presenting it, contending that if the affidavit is to be believed, it shows that appellant had prior knowledge of its recited facts. The affidavit stated that after Lewis' commission of the crime he returned to Tony's Place for a second time on the evening of October 28th, and "I saw Bob again in the place. I asked Bobby to come outside with me, & I bra*g*ed a little bit about what I had done. We had done something together about four or five years ago & I trusted him. Bob repli*de* that I should never have said anything to him, because even the knowledge of knowing anything about it would cause him trouble. I asked Bob if he wanted to go for a ride & he refused, so then I took off."

Since respondent relied upon the affidavit, as above stated, and since at the argument in this court both counsel stipulated that we could consider it in full, we must point out that, contrary to respondent's argument, much of the content could not have been known to appellant "in ample time to have presented it to the jury." While appellant might have known that Lewis admitted his own guilt, appellant did not know that Lewis would name as his accomplice another person ("his name as far as I know, is Dave Rielly") ; that Lewis would say that he had told appellant about the gun and when "they found the gun in my car," then "I remembered telling Bob about the gun, which is why I thought that he ratted on me. . . ." Lewis, "being real mad" and knowing "they had Bob held in mistaken custody" implicated appellant. The affidavit discloses a further motivation of Lewis: appellant's innocence "[w]ould also afford me an excellent chance of being found in*o*cent."

None of these admissions of Lewis were known, or could have been known to appellant; Lewis' first confession that appellant accompanied him in the crime diametrically contradicts the above statements; appellant's asserted knowledge of Lewis' complicity was a small part of the whole. Obviously no one, except the parties themselves, knows whether the repudiation is false or true, but the pieces of the repudiation, such as Lewis' two appearances at Tony's Place, at least superficially fit into the pattern of the testimony of the six other witnesses, who noticed Lewis' earlier and later visits. We would, indeed, reach a far-flung conclusion to hold that all of these segments of the repudiation, some minor and some vital in import, were known to appellant in advance so that they could have been presented to the jury.

In opposing the new trial upon this ground of lack of diligence the prosecution chiefly relies upon *People* v. *Greenwood* (1957), 47 Cal.2d 819 [306 P.2d 427]. In that case, which involved a conviction of assault by means of force likely to produce great bodily harm, a witness (Hartwell), who testified that "he was near the scene of the assault . . . , that he saw somebody run by him, but that defendant was not the man" (p. 821) later "purported to confess that he himself had committed the assault. . . ." (P. 821.) Upon this ground defendant sought, but was refused, a new trial. The Supreme Court emphasizes that upon the hearing of the motion the colloquy between the trial court and the counsel indicated defendant's pretrial awareness of the Hartwell " 'situation' " but that he "remained silent while Hartwell gave testimony purporting to implicate some unidentified third person." (P. 822.) Our case differs not only in the absence of appellant's knowledge of Lewis' implication of "Dave Rielly" as an accomplice but also in that Lewis originally pointed the finger of guilt at appellant and then, in repudiation, withdrew it, implicating "Rielly" instead. Hartwell in both instances contended that defendant had not been guilty of the assault. A witness' assertion of defendant's guilt, later denied, is not identical to a witness' reiterated assertions of defendant's innocence.

*People* v. *Goodwin* (1927), 202 Cal. 527 [261 P. 1009], and *People* v. *Reed, supra,* 27 Cal.App.2d 484, lend support to appellant's position on this issue. *Goodwin* involved separate trials of codefendants charged with murder. The testimony of the codefendant, Gaines, pointed to the guilt of Goodwin; the purpose of Goodwin's motion for new trial, and requested continuance of it, was to submit affidavits of witnesses who so placed Goodwin that he could not have committed the crime. As the basis for a showing of diligence the court relied upon a number of factors, including Goodwin's inability to obtain counsel until the night before the commencement of his trial. In the instant case appellant's counsel at the hearing of the motion for new trial had only been retained after the trial. The court said in *Goodwin,* "While the exercise of discretion by a trial judge in granting or denying a new trial is rarely interfered with upon appeal, in this case, the evidence offered being material and, under the circumstances, it not appearing that the defendant was lacking in diligence, we feel that the motion for a new trial should have been granted." (P. 539.) *Reed,* relying upon *Goodwin,* finds "no

lack of diligence on the part of defendant in seeking the new evidence. . . .'' (P. 493.)

We recognize that the matter of reasonable diligence as to the introduction of newly discovered evidence is so intimately related to the circumstances of each case that neither generality nor precedent can be decisive. As we have pointed out *supra,* Lewis' disclosure of his reasons for the confession themselves show that no amount of pretrial diligence could have sufficed to extract the actual facts from him. For all of the reasons stated we believe that the court erred in not granting the continuance.

■ We must reject appellant's final point that the evidence did not sustain his conviction. The identification of appellant by the victim, in itself, constituted substantial evidence.

In conclusion we cannot sustain the court's denial of the continuance of the hearing on appellant's motion for new trial in the face of the strength of the offered evidence and the weakness of the whole record to prove sure guilt. The weight of the evidence is too evenly balanced to permit of the exclusion of the repudiation of a codefendant's confession in the indecisive factual background of this case.

We affirm the judgment, reverse the order denying a new trial, and remand the cause to the superior court with directions to proceed with the motion for new trial in accordance with this opinion.

Bray, P. J., and Duniway, J., concurred.