Filed 12/23/14  P. v. Mitchell CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DEE WALTER MITCHELL, JR.,<br><br>  Defendant and Appellant. | F067246<br><br>(Super. Ct. No. 1437511)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from judgment of the Superior Court of Stanislaus County.  Linda A. McFadden, Judge.

Philip M. Brooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Following a jury trial in September 2012, Dee Walter Mitchell, Jr., was found guilty of the first degree murder of Martin Ham under Penal Code section 187,

subdivision (a),[1] and attempted robbery under sections 211 and 664. The jury also found true that Mitchell personally discharged a firearm, causing Ham's death, under section 12022.53, subdivision (d), and that the homicide came within the robbery special circumstance described in section 190.2, subdivision (a)(17)(A). He was sentenced to life without the possibility of parole.

Before trial, Mitchell's codefendant, Lavell Whitfield, negotiated an agreement with the prosecution for a guilty plea to voluntary manslaughter and other offenses with a sentence of 13 years eight months, in return for testifying against Mitchell.

Mitchell moved for a new trial, inter alia, based on newly discovered evidence that indicated another person was Ham's murderer and that Mitchell was not involved in the shooting. The new evidence, a letter which Mitchell received from a Stephen Johnson, indicated that a Deshawn Woody had confessed to shooting Ham and told Johnson that Mitchell "didn't shoot" and was not present with Woody and Whitfield when Ham was shot.

Mitchell's trial counsel subpoenaed Johnson to appear at the hearing for a new trial. Johnson, however, failed to appear for the hearing. Defense counsel requested a continuance and a bench warrant to compel Johnson's attendance. The trial court denied the request to continue the matter, noting it had no assurance Johnson would ever testify. The trial court then denied the motion for new trial finding, inter alia, that the proffered evidence was insufficient to "change the outcome of the case."

On appeal, Mitchell asserts that Whitfield's trial testimony was inadmissible as the product of police coercion and his trial attorney rendered ineffective assistance of counsel when he failed to seek exclusion of Whitfield's testimony. Mitchell also argues the trial court applied the wrong legal standard in denying his motion for a new trial and, had it applied the correct standard, it would have granted his new trial motion. Finally, he

---

[1] All future references are to the Penal Code unless otherwise noted.

2

maintains that the trial court should have granted the continuance so that Johnson could testify before the court ruled on the motion for a new trial. Based on these arguments, Mitchell seeks reversal of his convictions and a new trial ordered. In the alternative, he asserts that this matter should be remanded to the trial court with directions to rehear the motion for new trial.

As discussed below, we affirm the jury's verdict, but vacate the trial court's order denying the motion for new trial and conditionally reverse the judgment and remand this matter for another hearing on the motion for a new trial so as to allow Mitchell to present the testimony of Johnson and/or Woody.

# FACTS

## *Ham's Shooting*

On October 8, 2011, at approximately 4:00 pm, Ham was selling ice cream from a cart attached to his bicycle. He was shot and killed after two African-American males attacked him. Ham died from a single gunshot to the lower portion of his left chest. The bullet then exited his body, but was not recovered. However, a .380-caliber shell casing was found at the scene of the shooting.

Three witnesses saw the attack.

Anthony Morrell-Pardee heard a "popping" noise and saw two African-American males and Ham running around in the street. He looked the other way after deciding that they were "messing around" but then he heard another "pop" and looked again. He saw one of the African-American males, who was short and slender, pointing a gun while the other bigger male chased Ham. The gunman appeared to aim the gun at Ham, and then Morrell-Pardee heard another pop and saw some smoke. The shooter then turned around and jogged slowly into a nearby alley while the bigger male continued to attack Ham, punching and grabbing at him. Ham tried to get on his bicycle, but the bigger male grabbed the handlebar and started hitting Ham in the side of his face repeatedly. The larger male then ran into the same alley as the shorter man, while Ham was grabbing or

3

patting his chest or abdomen and asking for help. In court, Morrell-Pardee did not identify Mitchell as the shooter and he explained that he only saw a profile of the shooter's face.

Armando Mendoza heard a gunshot and then heard someone say either, "Finish him" or "Kill him" or "Shoot him." He then heard a second gunshot and saw two African-American males running towards the alley. Mendoza could not describe the two men he saw running. He never identified Mitchell as the shooter.

Theresa Kirkland saw two men "tussling with the ice cream man." The shorter of the two men was ripping at Ham's pockets, while the taller of the two men pulled on Ham's arm. The two men then ran across the street, stood there, and then the shorter male told the taller male to shoot Ham. The taller male pulled a gun out of his right pocket and shot it two or three times, hitting Ham. The taller male then passed the gun to the shorter male, who shot the gun one time. Ham then fell to the ground.

Kirkland testified that Mitchell was not one of the males that she saw involved in Ham's shooting.

### *Police are led to Mitchell and Whitfield*

A.S.[2], who was in the eighth grade when he testified, resided in the neighborhood where Ham was shot. On the night of the shooting, A.S. saw two males standing on the front porch of his neighbor's house. He knew that his neighbors were not home, which caused him to notice the two males. He saw the two males walk away at a fast pace, and they kept looking back over their shoulders. A.S. went inside and told his aunt, who notified law enforcement.

Police responded to A.S.'s location to talk to him. A.S. told the police that he thought he recognized one of the two males as a "Chris" who had been "hanging out" at a

---

[2]    This person is identified by initials in accordance with our Supreme Court's policy regarding protective nondisclosure of minors.

4

house on the corner of Martin Luther King and Maple Street. Police then drove A.S. to that location as a "driveby" and they saw a group of subjects standing on a driveway, which was later identified as 200 Martin Luther King Drive, Unit A. This was Mitchell's residence.

Police officers staked out a perimeter at Mitchell's residence. Sometime that same night, detectives went to the front door and knocked. At or around the same time, an officer positioned in the back of Mitchell's residence heard a bang, like a heavy object hitting a wooden fence. Police discovered a .380-caliber handgun along the fence of Mitchell's residence with the magazine still in it containing four unfired rounds. At trial, however, a police firearms expert was unable to say whether or not the .380-caliber casing found at the shooting scene had been fired from this particular weapon.

Police made contact with Mitchell at the front door of his residence. They spoke with Mitchell outside his residence for approximately 30 minutes before he allowed them to enter. Police found Whitfield in the back of the house approximately 40 minutes after they first knocked on the front door. Police took both Mitchell and Whitfield into custody that night.

Later that same night, police drove A.S. back to 200 Martin Luther King Drive, Unit A, to identify Whitfield and Mitchell. It was dark when the viewing occurred and A.S. remained in the police vehicle. The police shone the vehicle's lights on the first individual, whom A.S. recognized by his hair as the "bigger" of the two males he saw earlier that day. A.S., could "not really" identify the second male that he was shown because he did not see his face. A.S., however, after seeing the second male told police, "Yeah, that's him." A.S. identified the second male because his skin tone was lighter than the other male's skin tone.

In court, A.S. could not identify Mitchell as being one of the males he saw on October 8, 2011.

*Forensic Evidence*

There were no latent fingerprints on the recovered handgun and no gunshot residue was detected on either Mitchell or Whitfield. Mitchell's DNA, however, was discovered on the recovered gun as a "major contributor" while Whitfield's DNA was not identified on the gun. One impression had the same general pattern and size as the size 14 Creative Recreation shoes which Whitfield wore that day, but the findings were inconclusive. Another impression was "most likely" made by the red Vans shoes later found in Mitchell's house, which Whitfield saw Mitchell wear during the shooting and which Mitchell admitted to police were his. However, it was not "absolutely positive" that Mitchell's shoes caused the impression.

During a search of Mitchell's residence, police located and seized several cellular telephones. Police identified one of the phones as belonging to Mitchell and subpoenaed Mitchell's cell phone records. The records contained text messages from Mitchell's cell phone.

Two days before Ham's shooting Mitchell texted multiple people looking to purchase a gun. The day before the shooting Mitchell texted Manuel Retana asking for a gun and indicated he could pay $300. Later that same day, Retana texted Mitchell that he had a gun for him and Mitchell sent his uncle to pick it up. Retana texted Mitchell later that same day indicating that he gave the gun to Mitchell's uncle, texting "Thr u go, man. B easy, G."

On the day before Ham's shooting, Mitchell texted a "Markus L." indicating that he needed the clip from his old gun and he had the same kind, a ".380" caliber gun. On the morning of Ham's shooting, Mitchell texted a "Mando" asking for .380 bullets and that he needed them "ASAP." Mitchell also texted "Markus" early in the morning on the day of the shooting and indicated he was trying to hit a "lick"--which is street slang for a robbery.

6

Cell phone towers placed Mitchell's cell phone in the general area of the shooting at the time Ham was shot.

### Whitfield's Trial Testimony

Detectives interviewed Whitfield early in the morning after the shooting, starting at 2:20 a.m. Two days after the first interview, detectives interviewed Whitfield a second time. A detailed description of these interviews appears in part I.A.1, *post*.

Before trial, in May 2012, Whitfield signed a plea agreement with the prosecution to testify against Mitchell in exchange for a guilty plea and a sentence of 13 years and 8 months in prison.

At trial, Whitfield told the jury that he and Mitchell walked to West Side Market in the afternoon on the day of the shooting. On the way back from the market they saw Ham. Mitchell told Whitfield to hurry and catch Ham, but Ham turned around and came back. Mitchell then told Ham to empty his pockets. Ham began to curse at them, and he sounded drunk. Whitfield stated he had often seen Ham drunk before.[3]

Ham dismounted his bicycle and was about five feet away from Whitfield, and Mitchell was about the same distance away but to the side and on Whitfield's right. Whitfield punched Ham because Ham cursed at him.

Whitfield heard a gunshot, reacted by looking around, and he saw a gun in Mitchell's hand. Mitchell held a black gun up with an extended, straight arm at shoulder level. Whitfield identified the gun in court (People's exhibit 58) as being the gun that Mitchell held in his hand.

After the gunshot, Ham "backed up and moved his cart." The first shot missed Ham, but the gun then went off again and Whitfield heard Ham scream. Mitchell ran down an alleyway and Whitfield followed. They ran through a yard and several streets until they came to Whitfield's house, where Whitfield changed his pants and shoes.

---

[3]     Ham had a blood-alcohol content of .31 at the time of his death.

7

Mitchell then left Whitfield's house and Whitfield stayed behind talking on the telephone with his cousin for 30 or 40 minutes. Whitfield met Mitchell later that day near the crime scene and they saw police lights and yellow tape. Whitfield went back to his house for 10 to 15 minutes while Mitchell waited for him near the crime scene. The two then went back to Mitchell's house where Mitchell changed his clothes.

While they were both at Mitchell's house the police arrived and knocked on the front door. After hearing the police, Whitfield walked to the back of the house to the only bedroom. Mitchell was already in that back bedroom. Whitfield watched as Mitchell opened the bedroom window, tore open the screen, and threw a gun out the window.

After throwing the gun out the window, Mitchell then walked out of the bedroom. Whitfield stayed behind and he did not hear any of the conversation with the police. Whitfield remained in the bedroom for about 20 minutes or longer before he left and encountered the police.

Later that night, the police interviewed Whitfield at the police station. He testified that he was not truthful during that first interview when he had initially denied seeing anything about Ham's shooting. Whitfield then had a second interview with police a couple days later at juvenile hall. He testified that he was more truthful during his second interview. Whitfield said that he never discussed a plea agreement with the police during either of these two interviews.

Whitfield testified he touched Mitchell's black gun a couple of days before the shooting after Mitchell gave it to him to hold. He denied knowing Mitchell was carrying a gun when he and Mitchell walked to the market before encountering Ham. He also denied that Mitchell talked to him about his plans.

Whitfield recalled that Mitchell wore red Vans with white soles and white shoelaces on the day of the shooting, but on cross-examination he could not describe any other article of clothing that Mitchell wore that day.

8

On cross-examination, Whitfield agreed he had to tell the jury the same thing he told the officers in order to comply with the plea agreement. In addition to the guarantee of a reduced sentence, Whitfield testified he received some special favors on the day he signed the agreement--he was able to eat fast food and the police attempted to arrange a special visit for him with his family.

Whitfield denied chasing Ham or wrestling with him before the shooting.

On rebuttal, Whitfield reiterated he was telling the truth and not just repeating what he told the police in order to get the plea deal. Whitfield agreed that, from the very beginning, he said his fingerprints would not be on the gun, that he did not hold the gun when Ham was shot, and he did not throw the gun out of the window. Whitfield denied that he told the officers "what they wanted to hear" just so he could go home.

**DISCUSSION**

I.      WHITFIELD'S TRIAL TESTIMONY WAS NOT UNRELIABLE

Mitchell argues that Whitfield's testimony should not have been received at trial because the police used "coercive techniques" which rendered it unreliable. Mitchell contends that the admission of Whitfield's trial testimony violated his rights to due process and a fair trial under both the United States and California Constitutions. Because it was alleged error for Whitfield's trial testimony to be admitted into evidence, Mitchell seeks reversal of his convictions under either *Chapman v. California* (1967) 386 U.S. 18, 24 [was error harmless beyond a reasonable doubt] (*Chapman*) or the state standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [was it reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error] (*Watson*). Finally, Mitchell asserts that his defense counsel provided ineffective assistance of counsel when he failed to seek exclusion of Whitfield's trial testimony.

As discussed below in Part I.B., we hold that Whitfield's trial testimony was not unreliable because he was not coerced to testify in a particular fashion. As such, reversal is not required under either *Chapman* or *Watson*. As discussed below in Part I.C., we

9

hold that Mitchell's claim of ineffective assistance of counsel is without merit due to a lack of prejudice.

### A. Background

#### 1. *Whitfield's Statements to Police*

Whitfield was arrested on October 8, several hours after Ham's shooting. He was 15 years old at the time. Police interviewed him later that night starting at 2:20 a.m. and concluding at 3:44 a.m. Whitfield was handcuffed to his chair.

##### a. The First Interview

During the first interview, Whitfield consistently maintained his innocence and did not implicate Mitchell, who was 19 years old. He stated he and Mitchell saw Ham near the West Side Market and thought about buying some ice cream. They talked to Ham but did not buy anything. Ham then rode off and Whitfield and Mitchell continued on their way, walking back to Mitchell's house and then to Whitfield's house.

Whitfield admitted that Mitchell talked to Ham, but Whitfield denied speaking to Ham and was not "paying attention" to their conversation. After Mitchell finished talking with Ham, they walked away. The detectives told Whitfield that he could not be telling the truth because Ham was shot at a different corner, a location where witnesses said Mitchell and Whitfield were talking with Ham. Whitfield denied that he saw anybody get shot and he ran because he heard gunshots. He stated that Mitchell ran with him.

Whitfield stated that when they got to his house, Mitchell told him someone had been shot, and "[t]hey think it was the -- that ice cream man." The detectives asked Whitfield if they both ran down a particular alley "away from . . . Madison" and came out on to Jefferson, which Whitfield agreed that they did.

The detectives told Whitfield that witnesses said both Whitfield and Mitchell were talking to Ham before the gunshots and Whitfield reiterated that only Mitchell talked to Ham before the gunshots.

10

Whitfield was "positive" that Mitchell was not the person who shot Ham. He did not see Mitchell shoot Ham, and he did not believe that Mitchell could have shot him without him seeing it.

Whitfield admitted he was in the house at 200 Martin Luther King, Jr., Boulevard with Mitchell and others when the police arrived, but he continually denied throwing a gun out the bedroom window. He also did not see anyone else throw anything out the window. The detectives then told him that his story was "BS" because another witness, a police officer, saw someone throw the gun out from that same window where Whitfield claimed to be. The detectives admonished Whitfield to be true to himself and that his story did not "add up." Whitfield was told that he had to choose between spending the rest of his life in jail or showing the judge that he had potential, could be rehabilitated and released back to society.

The detectives then said, "The simple fact is simple, dude. Your friend shot the ice cream guy." Detective Pouv told Whitfield that if he was not the one who shot Ham then "I'd like to believe that it was [Mitchell] that did it. Okay? [¶] In fact, we found the gun at [Mitchell's] house. Okay? But you cannot tell us that none of you guys shot at the ice cream man." Whitfield continued to insist that he did not see Mitchell shoot Ham, that they both ran at the same time after they heard shots fired, and he did not see Mitchell throw the gun out the window.

Whitfield was told that he needed to "make decisions" if he did not want to go down for something he did not do. Whitfield was told that enough evidence existed to book him for murder and the detectives said that Mitchell was "probably going to give you up." Detective Pouv told Whitfield it was "plain and simple" that either he or Mitchell was the shooter. Whitfield was told that police had witnesses to prove he was the shooter, either on his own or because Mitchell asked him to do it, and either he or Mitchell were the shooter. Whitfield continued to insist that he did not see Mitchell shoot Ham.

11

A short time later, Whitfield changed his story slightly and stated that Mitchell ran before he did. Detective Pouv then stated:

> "If you're right here and [Mitchell] is right here and [Ham] is right here -- okay? -- and you heard the gunshot and [Mitchell] ran -- okay? – before … [Mitchell] ran, [Mitchell] confronts [Ham]. The shit didn't work out, [Mitchell] shot him, and you're right there and you saw that. Okay? And he ran past you, and you followed him. Okay? If that's the truth, then -- then tell us that's the truth. Is that how it went down?"

Whitfield did not respond to that scenario during the first interview. The detectives then told Whitfield that the police collected two sets of footprints that matched the shoes collected at Mitchell's house. Based on the set of footprints, the detectives stated that Whitfield and Mitchell must have run down a particular alley and crossed that yard, which Whitfield agreed happened. The detectives then asked whether Mitchell was in front of Whitfield or behind him when they ran through the backyard, and Whitfield stated that Mitchell was in front of him.

The detectives told Whitfield that the shooter had to have been someone standing next to Ham based on the shell casing found at the scene and only Whitfield and Mitchell were standing with Ham, and only Mitchell was close enough to be the shooter. The detectives reiterated that all the evidence pointed to both Mitchell and Whitfield, who were talking to Ham when he was shot and they both ran. In light of Whitfield admitting that he was with Ham and later running down the alley, the detectives asked him again if either he or Mitchell was the shooter and whether it was self-defense or "something else[.]"

Whitfield continued to deny that he was the shooter or that he saw Mitchell shoot Ham, and the detectives warned Whitfield that he would spend the rest of his life in jail if he did not start telling them something that "makes sense."

Whitfield then drew a map of what happened and he indicated in which direction he and Mitchell ran after the shooting, noting that Mitchell "took off first, and then I ran up behind ... not too far."

The detectives told Whitfield they could "almost guarantee" that Mitchell was going to "give [him] up." "One of you are [*sic*] going to talk. I say it's going to be him. Then I'm going to have to book a 15 year old for murder, dude." Whitfield, however, continued to deny that he knew the identity of the shooter.

Whitfield began to complain about an upset stomach and he asked to use the restroom. The interview was terminated at 3:44 a.m. and Whitfield was booked into juvenile hall.

### *b. The Second Interview*

Two days after the first interview, detectives interviewed Whitfield again. The first thing Whitfield said was, "I want to go home." During the second interview, Whitfield repeated that he had been walking with Mitchell when they saw Ham. Mitchell called Ham over and then "[e]verything happened." Mitchell talked to Ham while Whitfield stood off to the side "not really paying attention" and then Ham "got popped" but Whitfield still would not identify the shooter, only saying it was not him.

Mitchell expressed internal dilemma about giving the name to police, saying, "Something is telling me to say it, and something is telling me not to say it, like, 'Don't say that. Don't do it. Don't do it.' And something telling me, 'Go ahead. Go ahead.' But -- shit." And then "[i]t's something telling -- I got a feeling to don't say it, and I got a feeling to do say it."

Detective Pouv stated that "[t]he dude got popped. You were there. [Mitchell] was there. You say you didn't do it. I'd like to think that you didn't do it, but at the same time you're not telling me who did it. You feel me?"

When asked how many times Ham was "popped", Whitfield stated "[o]nce or twice" and then he admitted it was Mitchell who shot Ham. Whitfield also admitted that

13

it was the same gun that police found at the house outside the bedroom window. Whitfield, however, continued to deny that he tossed the gun out the window and he insisted that he did not see anybody who did. Detective Pouv then told him:

> "I don't want -- I don't want things to come back to you, seriously. If you tossed the gun, no big deal. You tossed the gun. The fact is you didn't do it right here. Okay? So that gun shouldn't be that big to you, to me, to anybody else. Okay? If [Mitchell] or someone else tossed the gun, then you -- again, just like how you said over here, you tell us. Okay?

> "By telling us the truth, you have something to benefit. And that is, down the road, okay, people [are] going to say, 'Hey, this guy is a kid. He's not that bad of a person. He's still young.' Okay? 'Give him another chance.' The DA, the judge is going to have to make that [*sic*] decisions. Okay? But it start [*sic*] right here between you and us.

> "Do you understand that?

> "So who tossed the gun out the window?"

In response, Whitfield said it was Mitchell who threw the gun out the window.

Whitfield then stated that Mitchell confronted Ham and said, "Empty your pockets." Mitchell then produced a gun and Whitfield did not see anything but he heard a loud "bang" and Ham screamed, and Whitfield took off running. Whitfield also heard Ham say, "Call the police." Whitfield only heard one bang and then Mitchell said, "Come on."

They went back to Whitfield's house, and Mitchell kept on saying, "I shot him. I shot him. I shot him."

B.     Whitfield's Trial Testimony Was Not Coerced and Not Unreliable

Mitchell contends that Whitfield's trial testimony was "inherently unreliable" because it was coerced after police convinced Whitfield to "adopt" their version of facts after persuading him that he would be convicted as the shooter if he did not agree. Mitchell relies principally on *People v. Badgett* (1995) 10 Cal.4th 330 (*Badgett*) and

14

*People v. Lee* (2002) 95 Cal.App.4th 772 (*Lee*) to establish that Whitfield's trial testimony should have been excluded from evidence.

### 1. *Standard of Review*

"Defendants have limited standing to challenge the trial testimony of a witness on the ground that an earlier out-of-court statement made by the witness was the product of police coercion." (*People v. Williams* (2010) 49 Cal.4th 405, 452.) Defendants generally lack standing to challenge a third party witness's Fifth Amendment privilege against self-incrimination, Sixth Amendment right to counsel, and defendants generally may not complain that the police violated a third party witness's Fourth Amendment rights. (*Ibid.*, citing *Badgett, supra,* 10 Cal.4th at p. 343.) A defendant, however, may assert a violation of his own right to due process and a fair trial based upon third party witness coercion "if the defendant can establish that *trial* evidence was coerced or rendered unreliable by prior coercion and that the admission of this evidence would deprive the defendant of a fair trial." (*Williams, supra,* at pp. 452-453, citing *People v. Jenkins* (2000) 22 Cal.4th 900, 966, 969; *Badgett*, *supra*, at pp. 347, 348.)

"Although the out-of-court statement itself may be subject to exclusion because coercion rendered it unreliable, it is more difficult for a defendant to establish that the court should exclude the witness's *trial testimony*." (*People v. Williams, supra,* 49 Cal.4th at p. 453.) The Supreme Court has explained that testimony of third parties offered at trial are not subject to exclusion "'unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony.'" (*Ibid.*, citing *Badgett*, *supra*, 10 Cal.4th at p. 348.) The defendant bears the burden to demonstrate "how the earlier coercion 'directly impaired the free and voluntary nature of the anticipated testimony in the trial itself' [citation] and impaired the reliability of the trial testimony [citation]." (*Ibid.*) "On appeal, we independently review the entire record to determine whether a witness's testimony was coerced, so as to render the defendant's trial unfair." (*People v. Boyer* (2006) 38 Cal.4th 412, 444.)

The courts have prohibited only those psychological ploys which, "'under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.]" (*People v. Jones* (1998) 17 Cal.4th 279, 297-298.) "'"[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." [Citation.] In terms of assessing inducements assertedly offered to a suspect, "'[when] the benefit pointed out by the police ... is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.]" [Citation.]'" (*People v. McWhorter* (2009) 47 Cal.4th 318, 357-358.) "'[M]ere questions, or exhortations to tell the truth or clear [one's] conscience or help [one]self by revealing facts as to the dominant part of [a codefendant] or some other person in the criminal enterprise'" are insufficient: "'[I]ntellectual persuasion is not the equivalent of coercion.' [Citation.]" (*People v. Hill* (1967) 66 Cal.2d 536, 548-549; see also *People v. Jones, supra*, at p. 298 [detective's telling defendant his answers could affect the rest of defendant's life did not establish coercion].)

        2.     *Analysis*

In *Badgett, supra,* 10 Cal.4th 330, the defendants were tried for murder. The primary prosecution witness was the 17-year-old girlfriend of one of the defendants, who testified he had admitted to her that he killed the victim. (*Id.* at pp. 339-340.) After the juvenile witness had been detained, her mother was advised by the authorities that the witness would be released from custody if she cooperated with the police. (*Id.* at p. 354.) The mother conveyed this promise to her daughter, who then provided a statement to the police implicating the defendants. Subsequently, the witness was given formal immunity and testified pursuant to the immunity agreement. (*Id.* at p. 340.) The defendants argued the witness's statements to police "were involuntary because they were the product of a promise of leniency." (*Id.* at p. 354.)

16

The *Badgett* court disagreed explaining: "All immunized witnesses are offered some quid pro quo, usually an offer of leniency. We have never held, nor has any authority been offered in support of the proposition, that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced…. [T]estimony given under an immunity agreement does not violate the defendant's right to a fair trial, if the grant of immunity is made on condition the witness testifies fully and fairly." (*Badgett, supra,* 10 Cal.4th at pp. 354-355.) "If an offer of immunity is not considered coercive, then an offer of release from custody in return for cooperation likewise should not render a witness's statement coerced." (*Id.* at p. 355.)

Here, the express terms of Whitfield's plea agreement required him to "TESTIFY COMPLETELY, ACCURATELY AND TRUTHFULLY AT ALL HEARINGS AND TRIALS REGARDING THESE CRIMES, INCLUDING AFFIRMATION OF PRIOR STATEMENTS" (boldface omitted) he provided to law enforcement. Whitfield's trial testimony given under the terms of this immunity agreement did not violate Mitchell's right to a fair trial. (*Badgett*, *supra,* 10 Cal.4th at pp. 354-355.) Although *Badgett* held that testimony from a plea agreement is deemed coercive and subject to exclusion from evidence where it requires the witness to testify consistently with the previous statements made to the police, that is not the situation here. (*Id.* at p. 358.) To the contrary, Whitfield's plea agreement required him to tell the truth and only affirm his prior statements to police. When all of Whitfield's trial testimony is considered, it is apparent that Whitfield understood he was to testify truthfully and not merely consistently with his previous statements. As such, *Badgett* does not require exclusion of Whitfield's trial testimony.

Moreover, the California Supreme Court has made it clear that "[t]here is nothing improperly coercive about confronting a lesser participant in a crime with his or her predicament, and offering immunity from prosecution for the witness's criminal role in

17

return for the witness's promise to testify fully and fairly. [Citations.]" (*People v. Boyer, supra*, 38 Cal.4th at p. 445.) "A prosecutor may grant immunity from prosecution to a witness on condition that he or she testify truthfully to the facts involved. [Citation.] But if the immunity agreement places the witness under a strong compulsion to testify in a particular fashion, the testimony is tainted by the witness's self-interest, and thus inadmissible. [Citation.] Such a 'strong compulsion' may be created by a condition '"that the witness not materially or substantially change [his or] her testimony from [his or] her tape-recorded statement already given to ... law enforcement officers."' [Citation.] [¶] On the other hand, [the high court has] upheld the admission of testimony subject to grants of immunity which simply suggested the prosecution *believed* the prior statement to *be* the truth, and where the witness understood that his or her sole obligation was to testify fully and fairly." (*Id.* at p. 455; see also *People v. Williams, supra*, 49 Cal.4th at p. 455; *Badgett, supra*, 10 Cal.4th at pp. 354-355.) This is so even when the witness is legally deemed an accomplice. (*People v. Avila* (2006) 38 Cal.4th 491, 594; see § 1111.)

The plea agreement here did not place Whitfield under a "strong compulsion" to testify in any particular fashion. Although Whitfield was threatened with prosecution if he did not fulfill the terms of the agreement, this does not establish coercion such that Whitfield's trial testimony should have been excluded. (See *People v. Boyer, supra*, 38 Cal.4th at p. 445 [no improper coercion found despite witness's making clear her primary reason for cooperating at trial was prosecution's offer of immunity from prosecution as accessory to murder in return for truthful testimony].) Whitfield understood he was required to testify truthfully and not in a specific manner. Whitfield's trial testimony was not unreliable and not based on any earlier coercion. (*People v. Boyer, supra*, at p. 445.)

The *Lee* case does not alter our conclusion. In *Lee*, the court held a third party witness's statement was coerced because the police threatened to charge the witness with the crime at issue if he did not name the defendant as the shooter. (*Lee, supra,* 95

18

Cal.App.4th at pp. 785-786.) The officer gave the witness a polygraph test and told the witness he was using "'high tech stuff'" a "'computerized polygraph system'" which was "'state of the art'" and accurate as a calculator. (*Id.* at p. 782.) The officer asked the witness if he had shot the victim and if he knew who the shooter was, and the witness answered both in the negative. (*Id.* at p. 783.) The officer then told the witness that the polygraph machine was "'copyrighted by [the] Johns Hopkins University applied physics laboratory--the same people that monitor the spacecraft when they go out and come back in.'" (*Ibid.*) The officer told the witness that the machine showed a 97 percent probability that he was the shooter. (*Ibid.*) The officer then went on to threaten to charge the witness with first degree murder unless he named the defendant as the killer. (*Ibid.*) The officer threatened (without any apparent truth) that "'other witnesses'" had information that pointed directly at the witness as the shooter. (*Ibid.*) The witness then stated that the defendant was the shooter. (*Id.* at p. 785.) The next day, however, the witness recanted his statement and testified at trial that he did not see who shot the victim. (*Id.* at p. 776.) The trial court allowed the prosecution to play a tape recording of the witness's statement as impeachment and substantive evidence against the defendant. (*Ibid.*)

On appeal, the *Lee* court analyzed California law regarding the use of deception to obtain a confession. (*Lee, supra,* 95 Cal.App.4th at p. 776.) The *Lee* court explained that the officer's statements "went beyond mere deceit as to the evidence pointing to [the witness] as the killer. He also went beyond merely exhorting [the witness] to tell the truth. He even went beyond threatening [the witness] with prosecution for first degree murder unless he named the real killer. [¶] [The officer] in essence told [the witness]: We will prosecute you for first degree murder unless you name [the defendant] as the killer." (*Id.* at p. 785.) The *Lee* court noted that the witness was never *Mirandized*[4] after

---

[4]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

19

the officer claimed the polygraph test showed it was the witness who was the shooter, which indicated the defendant, not the witness, was the real target of the investigation. (*Lee, supra,* at p. 786.) The court concluded that the interrogation of the witness was "not designed to produce the truth as [the witness] knew it but to produce evidence to support a version of events the police had already decided upon." (*Ibid.*)

Here, like the defendant in *Lee*, there is no evidence that the detectives advised Whitfield of his rights under *Miranda* before they questioned him. Like the defendant in *Lee*, Whitfield was threatened with prosecution of the murder. These similarities to *Lee*, however, are not enough to show that Whitfield's trial testimony was coerced and inadmissible.

Unlike *Lee*, the detectives here never deceived Whitfield about the state of the evidence. At no time did the detectives give Whitfield false information or lie to him, and they certainly did not resort to a fake polygraph test as a method to threaten Whitfield with prosecution for the murder. (*Lee, supra,* 95 Cal.App.4th at p. 783.) Instead of deceiving Whitfield, the detectives only questioned his story during the two interviews and merely confronted him with the facts as they knew them. It is well settled that law enforcement may confront a witness with what they know. (*People v. Holloway* (2004) 33 Cal.4th 96, 115.) The detectives urged Whitfield to tell the truth after he admitted he was present with Ham when Ham was shot, but would not divulge the identity of the shooter. The detectives accurately represented that Whitfield faced prosecution unless he gave a reasonable explanation about the details of the shooting, including the shooter's identity, and whether the shooting was "self-defense" or "something else." At no time did the detectives make any promises of leniency to Whitfield if he changed his story.

Moreover, unlike in *Lee*, Whitfield never recanted, at trial, his earlier statements to the detectives. To the contrary, Whitfield testified fully and freely at the trial and provided his own details. Coupled with the utter absence of police deceit or falsity in the interviews with Whitfield, the present situation is distinguishable from *Lee*.

20

Mitchell, however, further argues that Whitfield's statements to police, and his trial testimony, were unreliable because Whitfield merely adopted a "scenario" that detective Pouv suggested during the first interview that Mitchell confronted Ham, shot Ham, and then Mitchell ran past Whitfield and fled. The facts, however, do not support Mitchell's argument. Even during the first interview, it was Whitfield who first stated that Mitchell confronted Ham. Also, during the first interview it was Whitfield who initially suggested that Mitchell ran before he did. Whitfield did not "adopt" those facts from the police. Moreover, during the second interview when he admitted that Mitchell was the shooter, Whitfield provided his own details about the shooting that police never suggested, such as Ham screamed after he was shot and Ham said, "Call the police." Finally, at trial, Whitfield testified that he punched Ham just prior to the shooting, a fact that the detectives never discussed or suggested with Whitfield during the two interviews. The facts do not support Mitchell's argument that Whitfield's trial testimony was merely adopted from a police scenario.

Mitchell also argues that Whitfield's trial testimony was coerced based on a particular question defense counsel posed to Whitfield during cross-examination: "And in order for you to go home in ten years, you have to tell us the same thing that you told the officer; you have to tell us the same thing you told the officer back in April?" Whitfield responded in the affirmative. Mitchell contends that this exchange establishes that Whitfield's testimony falls into the "same category" as the witness's testimony in *Lee* in that the police questioning was not designed to get to the truth but to get Whitfield to adopt the version of facts the police had already decided to pursue.

The case of *People v. Fields* (1983) 35 Cal.3d 329 (*Fields*) is instructive on this issue. In *Fields*, defendant's sister, Gail, entered into a plea agreement under which she agreed to testify "as to the truth" of certain events in exchange for her plea of guilty to being an accessory to murder. (*Id.* at pp. 359-360.) In response to questions by defense counsel, Gail stated she agreed to testify in accord with her last statement to the police,

21

but in response to the district attorney's questions, she stated that she had agreed only to tell the truth. (*Ibid.*) After noting that Gail's statements concerning the terms of the plea agreement were not necessarily inconsistent, the *Fields* court held these statements were insufficient to demonstrate either that the plea bargain required her to testify in conformance with her earlier statement to police or that she believed that was the requirement. (*Id.* at pp. 360-361.)

The Supreme Court stated: "We recognize that a witness in Gail Fields' position is under some compulsion to testify in accord with statements given to the police or the prosecution. The district attorney in the present case obviously believed that Gail's last statement was a truthful account, and if she deviated materially from it he might take the position that she had breached the bargain, and could be prosecuted as a principal to murder. But despite this element of compulsion, it is clear, and the cases so hold [citation] that an agreement which requires only that the witness testify fully and truthfully is valid, and indeed such a requirement would seem necessary to prevent the witness from sabotaging the bargain. We believe the requirements of due process ... are met if the agreement thus permits the witness to testify freely at trial and to respond to any claim that he breached the agreement by showing that the testimony he gave was a full and truthful account." (*Fields*, *supra*, 35 Cal.3d at p. 361.)

Like in *Fields*, Whitfield was certainly under some compulsion to testify consistently with the statements he gave to the detectives. The prosecutor in the present case obviously believed Whitfield's last statements to the detectives were a truthful account. That is why they later offered the plea bargain to Whitfield and pursued the murder charges and special circumstances allegations against Mitchell. Clearly, if Whitfield deviated materially from his last statements, he might be in breach and subjected to prosecution as a principal to murder. However, despite this element of compulsion, Mitchell's due process rights were met because Whitfield's agreement simply required him to "TESTIFY COMPLETELY, ACCURATELY AND

22

TRUTHFULLY AT ALL HEARINGS AND TRIALS REGARDING THESE CRIMES, INCLUDING AFFIRMATION OF PRIOR STATEMENTS" (boldface omitted) he gave to law enforcement. The requirement that Whitfield was to affirm his prior statements did not require him to testify in accord with them regardless of the truth. He was simply agreeing to admit he made the earlier statements, many of which conflicted with his trial testimony. Instead, the agreement was clear that Whitfield was to testify truthfully. Like in *Fields,* Whitfield's agreement did not require him to testify in a particular way at trial. (*Fields, supra,* 35 Cal.3d at p. 361.) As such, Mitchell's due process rights were not violated.

Moreover, Mitchell's argument fails to take into consideration the rest of Whitfield's testimony. Before this crafted question was posed to him on cross-examination, Whitfield told the jury that he signed the plea agreement, took an oath to tell the truth, and that, in exchange for his truthful testimony, he would receive a sentence of 13 years eight months in prison. Further, at the end of his trial testimony Whitfield reiterated that he was telling the truth and not just repeating what he told the police in April in order to get the deal. Whitfield also denied that he told the detectives "what they wanted to hear" just so he could go home. At no time during Whitfield's first or second interviews did police indicate to him that he had any deal or that police wanted him to take a plea agreement. The crafted question to Whitfield from defense counsel does not establish that Whitfield's trial testimony was coerced and unreliable.

More importantly, even assuming that Whitfield's statements to the detectives were coerced, reversal is not required. Nearly one year had passed between the time of Whitfield's interviews (October 2011) and his trial testimony (September 2012). Passage of time serves at least partially to dissipate the coercive effect of an interrogation, especially when, as here, Whitfield received a reduced sentence under an agreement that was not conditioned upon the consistency of trial testimony with an earlier statement and he was represented by independent counsel. (See *People v. Williams, supra,* 49 Cal.4th at

23

pp. 454-455.)  The plea agreement here was not dependent on whether Mitchell was convicted.

Moreover, the defense had a full and fair opportunity, with knowledge of the terms of the plea agreement, to impeach Whitfield's testimony and to argue his credibility to the jury.  Under these circumstances, Mitchell was not denied a fair trial.  (*People v. Sully* (1991) 53 Cal.3d 1195, 1218 [defense's ability to impeach testimony of witness testifying under a plea agreement is a factor in showing a fair trial].)

Based on the whole record, Whitfield's trial testimony was not subject to exclusion because Mitchell has not demonstrated how earlier coercion directly impaired the free and voluntary nature of Whitfield's anticipated testimony and impaired the reliability of his actual trial testimony.  (*People v. Williams, supra,* 49 Cal.4th at p. 453.) As such, Mitchell has not shown that he was denied due process and a fair trial.  (*People v. Jenkins, supra,* 22 Cal.4th at p. 968.)  Thus, Mitchell is not entitled to reversal of his convictions under either *Chapman, supra,* 386 U.S. at p. 24, or *Watson, supra,* 46 Cal.2d at p. 836, because he has not established a due process error.  (*People v. Jenkins, supra,* at p. 968.)

## II.  MITCHELL'S TRIAL COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE OF COUNSEL

Mitchell argues that his trial attorney provided ineffective assistance of counsel when he did not object to Whitfield's testimony or seek to have it excluded at trial.  As discussed above, however, Mitchell's argument is without merit because Whitfield's trial testimony was properly admitted.  As such, Mitchell cannot establish any prejudice stemming from his counsel's alleged failure in this regard.  Because Mitchell's claim of ineffectiveness may be rejected due to a lack of prejudice, we will follow that course. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

24

III.    THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO
        GRANT A CONNTINUANCE

Mitchell contends the trial court abused its discretion in denying his motion for new trial, asserting the lower court failed to follow the standard articulated by this court in *People v. Soojian* (2010) 190 Cal.App.4th 491 (*Soojian*).[5]  He contends that, had *Soojian* been followed, the trial court would have granted the motion for new trial.  He also argues the trial court should have granted a continuance after his subpoenaed witness, Johnson, failed to appear at the hearing on the new trial motion.  He seeks reversal of his convictions or, in the alternative, requests this matter be remanded to the trial court to rehear the motion for new trial.

We are persuaded the trial court abused its discretion in not granting a reasonable continuance after Johnson, a subpoenaed witness, failed to appear at the hearing.  As such, we vacate the trial court's April 15, 2013, order denying a new trial and remand for another hearing pursuant to section 1181, subdivision (8).  In light of the remand, we do not address Mitchell's remaining arguments.

A.    Background

On March 11, 2013, Mitchell filed an amended motion for (1) a new trial based on newly discovered evidence pursuant to section 1181, subdivision (8), and (2) a verdict contrary to the evidence adduced at trial pursuant to section 1181, subdivision (6).[6]  The newly discovered evidence was based on a handwritten letter, attached to the amended motion, that Mitchell received after he was convicted but before sentencing.  The letter was written by Johnson, which stated:

---

[5]    A defendant is entitled to a new trial based on newly discovered evidence if "he…establishe[s] that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented."  (*Soojian, supra,* 190 Cal.App.4th at p. 521.)

[6]    Mitchell's present appeal does not challenge the court's denial of the motion for new trial based on a verdict contrary to the law or evidence.

25

"I Stephen Johnson in early October of 2011[,] I ran into Deshawn Woody and [Whitfield] while hanging out at [Whitfield's] cousin Johnae's house[.] [D]eshawn asked me if [he] could talk to me on the back porch. So we went out back [and] [D]eshawn asked me if I had 380 shell's [*sic*][.] [H]e told me he had 2 gunz [*sic*] that needed ammo[,] so I had said yes because there was no need for me to have them[.] [S]o I gave them to him in a sock I had[.] [H]e pulled out a grey [R]emington 380 and loaded the magazine with seven shells maybe five Im [*sic*] not sure[,] he said they fit. [L]ater [Whitfield] came outside from rolling a blunt[.] Deshawn tells him to let him see the other gun because he finnaly [*sic*] got shells for it[.] [Whitfield] pulled a black handgun from his hoodie pocket[,] this was another 380 but a larcin brand[.] I only had five shell's [*sic*] left so I gave them to [Whitfield][.] [W]e sat smoking[,] chilling and then I left[.] *I hear almost four month's [sic] later that [Mitchell] is in jail for shooting a[n] ice cream man. I know in my heart from talking to Deshawn that [Mitchell] didn't shoot and wasn't there with them, I ask [sic] him who shot the ice cream man and all he said that it wasn't [Mitchell] and that he feels bad that [Mitchell] went to jail for something he and [Whitfield] did by accident.* I personaly [*sic*] know [Mitchell] and I know he wouldn't do nothing like this[,] he loves his kids more than anything[.] I can help you."

Johnson also wrote his phone number at the bottom of the letter.

Mitchell's motion for a new trial was originally set for hearing on November 20, 2012, to coincide with the sentencing hearing. Both the hearing on the motion and the sentencing hearing were continued to March 25, 2013. The trial court then continued the matter until April 15, 2013, to give defense counsel an opportunity to secure Johnson's testimony.

On April 15, 2013, the trial court heard Mitchell's motion for a new trial. Despite being personally subpoenaed on April 11, 2013, Johnson failed to appear. Defense counsel informed the trial court at the hearing he did not have a phone number for Johnson (although it was included in Johnson's letter). Mitchell's counsel provided proof service of the subpoena to the court and requested a continuance of the motion. The prosecutor argued against a continuance, stating that defense counsel was diligent in seeking Johnson's presence and Johnson was familiar with the court process having been

26

recently convicted of several felonies, and inferred he was on probation. The prosecutor argued that Johnson's failure to appear went directly to his reliability and veracity as a witness.

The trial court acknowledged Johnson's letter was newly discovered evidence that could not have been discovered prior to trial. The court, however, noted it had not seen any effort by the defense to secure DeShawn Woody's presence, who may be a more important witness, or any evidence showing Woody's connection with Whitfield. Defense counsel told the court he and his investigators tried to subpoena Woody but were unable to locate him. Counsel told the court that, after receiving Johnson's letter, the defense team obtained booking photos of a Deshawn Woody and they determined Woody was living on Carver Road in Modesto. The defense's process server attempted six times to serve Woody at that address but could not find him. The server spoke with Woody's (apparent) sister, who confirmed that Woody lived there, but after the last attempt, Woody's (apparent) brother came to the door and said Woody was not present and yelled at the server to never come back. Counsel told the court he had a declaration from his process server evidencing their efforts to secure Woody's attendance, but did not provide the declaration to the court.

Defense counsel asked that Woody be found legally unavailable and argued Woody's statements to Johnson would be admissible as statements against his penal interest. Counsel also argued the court should not decide Johnson's veracity until Johnson could be brought into court, and he asked the court to issue a bench warrant.

The court stated this was a case where there was "overwhelming evidence" regarding Mitchell's guilt. The court noted Whitfield identified Mitchell, Mitchell's shoes were a match, Mitchell's text messaging history indicated he purchased a gun, a gun matching the murder weapon was found at Mitchell's house while Mitchell was there, Mitchell and Whitfield were together after the murder and arrested at the same

27

time, and an independent eye witness identified Mitchell.[7] The court, however, commented if Woody came in and he clearly resembled Mitchell, and he happened to live exactly where Mitchell lived, and there was some other evidence showing he spent time with Whitfield, and he was with Whitfield on the day of the shooting, and he had access to the gun, and also had the same type of shoes as Mitchell, then that would be a different situation. The court concluded Johnson's "statement that there's this other guy out there that confessed to the murder just seems too remote, and to this Court, it wouldn't have any effect on a jury, on the jury verdict in this case."

In response, defense counsel observed that, although Woody now lived on Carver Road, he had previously lived on Spencer Avenue in 2010, which was in the area of the shooting. Moreover, defense counsel represented that Woody is five feet 11 inches tall, weighs 140 pounds and is African-American, which meant he resembled Mitchell.

Defense counsel also said he personally met with Johnson about his letter and asked Johnson if the information was correct, and Johnson indicated it was. Counsel stated Johnson said he did not initially come forward with the information because (at the time) he was 17 and afraid that he might suffer consequences from Woody or Woody's family. Counsel informed the court that Johnson had indicated to him that he now "had to do the right thing, that Mr. Mitchell is not guilty, and he shouldn't be in custody for a crime he didn't commit."

Further, counsel observed there was some evidence to corroborate Johnson's statement that Mitchell was not the person involved with Whitfield in the crime because witness Theresa Kirkland testified that Mitchell was not the person she saw at the crime scene. Also, counsel noted that although juvenile witness A.S. had identified Mitchell in a one-person showup, his identification was subject to question because he admitted his

---

[7] We assume the trial court was referring to the A.S.'s infield identification of appellant outside of his residence, after he had been arrested, and not at the crime scene.

identification was based solely on the fact Mitchell had lighter skin than Whitfield.[8]

Moreover, counsel argued Mitchell's DNA on the firearm was not conclusive proof of guilt because it was not clear "when he touched that firearm, whether it was before, during or after the commission of the crime."

The trial court commented that, given the fact Johnson met with defense counsel and then did not appear in court, with no explanation, led the court to believe Johnson was not going to be "real cooperative in coming in." The court speculated "[m]aybe that's because what [Johnson] said in the letter isn't truthful. And that's the way this Court's viewing it. He doesn't want the Court to be able to have him take an oath as a witness and testify that this letter is in fact true. It's a big difference between putting something in the paper and actually testifying under oath, at least for some people."

In denying the motion to continue, the court concluded:

> "I think I have to look at this through the eyes of a jury. [¶] And if I were to have the evidence of Mr. Johnson coming in and testifying that this is what he overheard, I would find it hard to believe, given all of the other evidence in this case. And I really don't have any belief that Mr. Johnson will appear. I can issue a warrant for him and maybe they can find him. Maybe they can't find him. And that leads to [a] lot of uncertainty as far as the People are concerned. And if I thought that there would be any -- any chance that justice would not be done, then I'd continue this case. But I'm convinced based on the evidence that I saw during this trial that the jury made the right decision here. They had every evidence to make that decision and that hearing this additional piece of evidence isn't going to really change the outcome of the case. And so I think continuing this case wouldn't really benefit Mr. Mitchell's case any. [¶] ... [F]rom what I've heard, the evidence from Mr. Johnson

---

[8]     It is important to note that A.S.'s in-field show-up was related to seeing two African-American males on the front porch of a neighbor's home, not to any identification of suspects at the scene of the shooting. Also, at trial, A.S. could not identify Mitchell as being one of the males he had seen on October 8, 2011.

wouldn't change the outcome of this case. And so the motion to continue the motion for new trial is denied."

In light of the court's denial of the requested continuance, defense counsel agreed to stipulate to the prosecution's earlier proposal that, for purposes of the hearing on the new trial motion, Johnson's testimony (if had he appeared) would have been consistent with the statements in his letter. Counsel asked that the motion for new trial be granted on that basis. The court, however, denied the motion on the merits, stating:

> "Looking at the totality of the evidence in this case, that evidence points to one person being involved, and that being Mr. Mitchell in this Court's view, and there are, if you looked at each individual point, you could find maybe a reasonable doubt with each individual point, but given the cell phone records, given the location where Mr. Mitchell was at the time of the shooting, given the DNA evidence, given the shoe print evidence, given his location with [Whitfield] and given [Whitfield's] testimony, although [Whitfield] may have not been always honest with the police and may have had some issues with his testimony in trying to make himself look less culpable, there would be no reason why [Whitfield] would want to identify Mr. Mitchell, even, over this other individual. They were both friends. They were found in the same house together, so [it] wouldn't make sense [Whitfield] would come in here and testify that Mr. Mitchell was with him. He provides additional insight into what took place, although clearly was trying to minimize his culpability for the actions given the testimony of some of the other witnesses. So motion for new trial is denied."

B.      Legal Standard to Grant a Continuance on a Motion for New Trial

"Continuances shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) The trial court has broad discretion in determining whether good cause exists for a continuance. (*People v. Alexander* (2010) 49 Cal.4th 846, 934.) The denial of a motion for continuance is reviewed under the abuse of discretion standard. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.)

In the context of a trial, there is usually good cause for a continuance when a witness, who was served with a subpoena, fails to appear as commanded. (*Jensen v.*

30

*Superior Court* (2008) 160 Cal.App.4th 266, 271; *Gaines v. Municipal Court* (1980) 101 Cal.App.3d 556, 559-560.)

In seeking a continuance due to a missing witness, the defendant has the burden of showing he exercised due diligence to secure the missing witness's attendance, the witness's expected testimony was material and not cumulative, the testimony could be obtained within a reasonable time and the facts to which the witness would testify could not otherwise be proven. (*People v. Beeler* (1995) 9 Cal.4th 953, 1004 (*Beeler*); *People v. Howard* (1992) 1 Cal.4th 1132, 1171.) While these factors must be evaluated on a case-by-case basis, ultimately the question becomes "whether substantial justice will be accomplished or defeated by a granting of the motion." (*People v. Laursen* (1972) 8 Cal.3d 192, 204.) Further, in order for a continuance to be warranted, the defendant need not show the proffered testimony is "vital," only that it is material. (*Jennings v. Superior Court* (1967) 66 Cal.2d 867, 876.)

C.     Analysis

The case of *People v. Gaines* (1961) 192 Cal.App.2d 128 (*Gaines*), is instructive. In *Gaines*, the defendant was convicted of robbery along with his codefendant. The evidence was not strong regarding the defendant's guilt. The inculpatory evidence consisted of a stranger's identification and the defendant's reaction when the police confronted him with his codefendant's confession. The defendant had a strong alibi defense in that six witnesses testified at trial the defendant was elsewhere at the time of the robbery. (*Id.* at p. 134.)

Following the verdict, the defendant moved for a new trial asserting his codefendant's confession had been false and the defendant had nothing to do with the robbery. The defendant asked for a continuance so he could obtain affidavits and testimony of his codefendant to the effect defendant did not accompany the codefendant or participate in the robbery. (*Gaines, supra,* 192 Cal.App.2d at p. 131.) The court

31

denied the motion, stating such a procedure could not be followed and it would not open the case to allow codefendant to testify.  (*Ibid.*)

On appeal, the *Gaines* court held it was prejudicial error to deny the request for a continuance.  The court noted "[t]he elements that determine whether or not a court arbitrarily rejected a request for a continuance of a motion for a new trial cannot be categorized.  They are not subject to precise delineation fixed by precedent."  (*Gaines, supra,* 192 Cal.App.2d at p. 134.)  The *Gaines* court commented the case was not "black and white" where the "shadow of guilt" fell across each and every page of the transcript.  (*Ibid.*)  Although the court understood the alibi witnesses might have been untrustworthy, the court noted the prosecution's case depended on two major contributors: the witness's identification and "the asserted reaction of guilt of [the defendant] upon the confrontation of his codefendant's confession."  (*Ibid.*)

The *Gaines* court held it was unreasonable for the trial court to deny the sought continuance "to prove the repudiation of a confession which was crucial in the circumstances of this case."  (*Gaines, supra,* 192 Cal.App.2d at p. 135.)  The appellate court noted "the importance of the offered proof of repudiation of the confession so far outweighed any possible inconvenience of delay that the refusal constituted 'a breach of discretion on the part of the trial judge....'  [Citation.]"  (*Ibid.*)  The *Gaines* court affirmed the judgment but reversed the trial court's order denying a new trial and remanded the matter to the lower court with directions to proceed with the motion for new trial in accordance with the opinion.  (*Id.* at p. 138.)

Mitchell has demonstrated Johnson's testimony was not only material but was crucial to a potential new trial.  The strongest evidence against Mitchell was Whitfield's testimony describing how Mitchell shot Ham.  Johnson's testimony that Mitchell was not present at the shooting, if found credible by the trial court, would directly contradict the strongest evidence introduced at trial against Mitchell, which is the standard a trial court utilizes when ruling on a motion for new trial.  (*People v. Martinez* (1984) 36 Cal.3d 816,

32

823 [standard on motion for new trial is whether "newly discovered evidence contradicts the strongest evidence introduced against the defendant."])

Here, one eyewitness, Theresa Kirkland, testified Mitchell was not involved in Ham's shooting. As in *Gaines*, the importance of Johnson's testimony far outweighed any inconvenience of reasonable delay. After Johnson failed to appear, Mitchell was left with only an unsworn letter to support his motion for a new trial. Although the parties stipulated Johnson would testify consistently with his letter, it is apparent the court did not find the unsworn letter credible, at least in part, because Johnson failed to appear. This factor establishes why it was important for the trial court to grant a reasonable continuance to give Mitchell, or the sheriff if a bench warrant was issued, an opportunity to locate Johnson and either obtain his affidavit under oath in compliance with section 1181, subdivision (8), or bring Johnson to court to testify. Johnson's letter raises many follow-up questions that may help explain or clarify the ambiguities contained in the letter. Johnson's failure to appear, and the denial of a continuance of any length, prevented Mitchell from presenting credible evidence, let alone "the best evidence" as required, in support of his motion for new trial. (*Beeler, supra,* 9 Cal.4th at p. 1004; *People v. Howard* (2010) 51 Cal.4th 15, 43.) We note that Mitchell testified at trial that he did not know Woody, yet Johnson's letter places Woody and Mitchell together shortly before the shooting.

It is speculation why Johnson failed to appear, as is respondent's argument that it is "unlikely" Johnson would have appeared "even if given more time." Whether or not Johnson may or may not appear, Mitchell should be afforded a meaningful opportunity to present his best evidence in support of his motion.

It is further speculation what Johnson will actually state under oath, how the trial court will view his credibility under oath, and how much weight, if any, the trial judge will give Johnson's sworn statements. Because of that uncertainty, respondent's argument is without merit that, had the court granted the continuance, the result would

33

have been the same once Johnson appeared and testified to the facts contained in the letter.

Essentially, the trial court denied defendant's request to continue the new trial hearing for two reasons: first, that it was likely that Johnson was uncooperative and would remain so; and second, that his testimony about the letter would not have changed the outcome because the evidence against defendant was so strong.

Even if Johnson was uncooperative and intentionally disobeyed the subpoena, we believe defendant was still entitled to have that subpoena enforced. The assertion that Johnson's failure to appear means he did not want to testify—even if true—does not necessarily lead to the conclusion that, once compelled to testify, he would not have given sworn testimony consistent with the contents of the letter. The trial court appears to have drawn that conclusion, which we think is error.

Understandably, if the proffered testimony was irrelevant, inadmissible or contained such nominal probative value that its consideration could not have changed the outcome, the trial court would be acting within its discretion in denying a request to continue the new trial motion hearing to present such evidence.

No one contends that the information contained in the Johnson letter is irrelevant. However, respondent contends that Johnson's testimony about the letter is inadmissible; but, the trial court did not make such a finding, let alone base its rulings (on the continuance request or on the merits of the new trial motion) on the alleged inadmissibility of Johnson's testimony about the contents of the letter. While portions of the letter may be inadmissible, Woody's statement to Johnson that he felt bad because Mitchell went to jail for what Woody (and Whitfield) did is clearly against Woody's penal interest. (Evid. Code, § 1230.) The only other requirement for its admission under Evidence Code section 1230 is that Woody be unavailable as a witness. Although the defense informally described for the trial court its efforts to serve Woody, it was not called upon to actually prove Woody's unavailability under Evidence Code section 1230

34

since the trial judge did not base its ruling on the alleged inadmissibility of Johnson's proffered testimony. If, on remand, the trial court questions the admissibility of Johnson's testimony under Evidence Code section 1230 because the unavailability of Woody has not been established, then defendant should be given the opportunity to prove his unavailability. Thus, if the defense establishes that Woody is unavailable and Johnson testifies that Woody told him that he felt bad because Mitchell went to jail for what Woody (and Whitfield) did, that testimony would be admissible under Evidence Code section 1230.

The trial court also based its decision denying the continuance request on the strong evidence of defendant's guilt. The evidence was strong, but the most damaging evidence was that offered by Whitfield. Johnson's expected testimony that Woody and Whitfield committed the act that sent Mitchell to prison would undercut Whitfield's testimony against defendant. Not until Johnson actually testifies or refuses to testify (or cannot be found), can the trial court reasonably conclude that he would never testify or that his testimony would be completely incredible and unreliable.

This is not to say that Johnson's testimony, if received, would mandate a new trial. The trial court has wide discretion when ruling on the merits of the new trial motion. (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.) It is the trial judge that must determine the weight to be given to the newly-discovered evidence in support of the motion for new trial, including "the truth of the matters shown thereby, and the materiality and probability of the effect of them if believed to be true. [Citation.]" (*People v. Byrne* (1911) 160 Cal. 217, 226.) The trial court is granted great deference because it was the trial court that observed the witnesses and had a superior opportunity to understand the case. (*People v. Shoals* (1992) 8 Cal.App.4th 475, 488, citing *People v. Hayes* (1985) 172 Cal.App.3d 517, 524-525; *People v. Butts* (1965) 236 Cal.App.2d 817, 827.) With these principals in mind, we remand.

35

However, as to the request for a continuance of the new trial motion hearing, given that the request was based on newly discovered evidence, that was, if believed, significant evidence, that it was arguably admissible, that Johnson was subpoenaed and failed to appear, that the defense requested a bench warrant be issued and the hearing continued so that Johnson's testimony could be received, we find it was an abuse of discretion to deny the request for a reasonable continuance of the new trial hearing to permit the defense a reasonable opportunity to compel Johnson to testify (and to make additional efforts to try to locate Woody).

The law favors a continuance to secure a subpoenaed witness's expected testimony where, like here, the expected testimony is material and not cumulative. (*Jennings v. Superior Court, supra,* 66 Cal.2d at p. 876.) The requested continuation was warranted even though the trial court previously continued the hearing from March 25, 2013, to April 15, 2013, to give Mitchell time to subpoena Johnson. Defense counsel demonstrated sufficient diligence in attempting to secure Johnson's testimony.

Even if there was a serious dispute about defense counsel's diligence, the continuance should have been granted given the rights implicated. (*See U.S. v. Flynt* (9th Cir. 1985) 756 F.2d 1352, 1359-1360 [although defendant "might have exercised greater diligence than he did," the court finds "the degree of diligence to have been sufficient" because "the continuance would have served a useful purpose, granting the request would not have inconvenienced the court, the other party or any witnesses, and [defendant] has suffered severe prejudice as a result of the denial of his motion"].) Granting a continuance would not have inconvenienced the court or prejudiced the prosecution. Mitchell, however, suffered severe prejudice as a result of the denial.

In light of the extreme importance of the continuance to the defense and because there was no prejudice to the prosecution, it was an abuse of discretion to deny a continuance to give Mitchell a reasonable opportunity to present Johnson's sworn testimony. Thus, we vacate the trial court's order denying a new trial, conditionally

36

reverse the judgment and remand for another hearing pursuant to section 1181, subdivision (8). If the trial court denies the new trial motion, the court shall reinstate the judgment. If the court grants the motion, defendant may be retried. In light of the remand, we do not address Mitchell's remaining arguments, but offer the following guidance for the trial court.

On remand, the trial court is directed to issue its ruling under the standard articulated in *Soojian, supra,* 190 Cal.App.4th 491. "[W]hen a defendant makes a motion for a new trial based on newly discovered evidence, he has met his burden of establishing that a different result is probable on retrial of the case if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented." (*Id.* at p. 521.)

Further, in ruling on the merits, there are evidentiary issues the parties and the court should address at the continued hearing. Johnson's letter is double hearsay. (Evid. Code, §§ 1200, subd. (a), & 1201.) The prosecution did not challenge, and the trial court did not address, the admissibility of Johnson's letter. If Johnson fails to provide evidence under oath at the next hearing, it is not apparent whether both levels of hearsay in Johnson's letter have an exception, rendering the letter inadmissible when offered for its truth. (*People v. Arias* (1996) 13 Cal.4th 92, 149.) If Johnson provides evidence under oath, the evidentiary issue is reduced to the second level of hearsay, i.e., whether Woody's statements are admissible. At the last hearing, defense counsel argued Woody's statements were admissible as an "unavailable" declarant, alluding to Evidence Code section 1230. The trial court did not address that issue. Hearsay evidence may be used in support of a motion under section 1181, subdivision (8). (*People v. Gaines* (1962) 204 Cal.App.2d 624, 627; *People v. Fluery* (1958) 161 Cal.App.2d 630, 635.) However, a new trial is not warranted if based solely on inadmissible hearsay. (See *People v. Hayes* (1999) 21 Cal.4th 1211, 1259; *People v. Merrill* (1951) 104 Cal.App.2d 257, 268.) Thus,

37

the trial court should rule on whether Mitchell's newly offered evidence is admissible or not.

## DISPOSITION

The April 15, 2013, order denying a new trial is vacated. The judgment is conditionally reversed and the matter is remanded for consideration of new hearing on a motion for a new trial, consistent with this opinion, pursuant to Penal Code section 1181, subdivision (8).  At the conclusion of the hearing, if the trial court denies the motion for a new trial, the trial court is directed to reinstate the judgment, which shall stand affirmed. If the trial court grants a new trial, the judgment shall stand reversed and the defendant may be retried.

_____

Franson, J.

WE CONCUR:


_____

Kane, Acting P.J.


_____

Poochigian, J.